UNITED STATES, Appellee

v.

OSCAR A. WHITE, Private E-1, U. S. Army, Appellant

3 USCMA 666, 14 CMR 84

667

LT COL Herman P. Goebel, Jr., U. S. Army, and 1ST LT Ivan E. Barris, U. S. Army, for Appellant.

LT COL William R. Ward, U S. Army, 1ST LT Bernard A. Feuerstein, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Following his conviction by a general court-martial at Fort Riley, Kansas, of fraudulent enlistment and desertion,[1] the accused was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for four years. Intermediate appellate tribunals have affirmed the findings and sentence. We granted the accused's petition for review to determine the competency of a certificate of identity received in evidence in connection with the charge of fraudulent enlistment, and the sufficiency of the evidence to support the finding that the desertion was terminated by apprehension.

At the trial, the prosecution relied principally upon documentary evidence to establish the offense of fraudulent enlistment. Included in this evidence were duly authenticated photostatic copies of enlistment records and a report of separation, the originals of which form a part of the official records maintained in the office of The Adjutant General of the Army. These exhibits show the following: (a) On December 19, 1950, Oscar Alvin White, of 1411 West A. Street, Joplin, Missouri, enlisted in the Army at Butte, Montana. (b) Private Oscar Alvin White, who enlisted in the Army on December 19, 1950, at Butte, Montana, and whose home address was noted as 1411 West A. Street, Joplin, Missouri, was separated from the service with an undesirable discharge on June 15, 1951, for fraudulent enlistment predicated upon concealment of prior service. (c) Representing that he had no prior mil-

itary service, Oscar Alvin White, of 1411 West A. Street, Joplin, Missouri, enlisted in the Army at Tulsa, Oklahoma, on October 25, 1951.

Other evidence indicated that Army regulations prohibit the reenlistment of a soldier discharged for fraudulent enlistment, and, that subsequent to his enlistment of October 25, 1951, the accused received pay and allowances. Thus, there was evidence of each essential element of proof of the offense charged. Manual for Courts-Martial, United States, 1951, paragraph 162. The accused's identity as the person referred to in each of the exhibits described above was clearly established by the identity of name, address, and place of enlistment. Jacobs v. United States, 24 F2d 890 (CA DC Cir); Hefferman v. United States, 50 F2d 554 (CA 3d Cir). However, the prosecution did not rest on this showing. Testimony of an agent of the Criminal Investigation Division established that while these charges were pending, the accused's fingerprints were taken on a card provided for the purpose. This card was then forwarded to the office of The Adjutant General. There, the fingerprints were compared with others on file in that office, and the results of this comparison were reported in a certificate executed by an Assistant Adjutant General. This certificate, received in evidence over a defense objection, recited the following:

"... I further certify that the fingerprints, herewith attached, purporting to be those of Oscar A. White, taken 21 November 1952, have been compared by a duly qualified fingerprint expert, on duty as such in this

---

[1] Articles 83 and 85, Uniform Code of Military Justice, 50 USC §§ 677, 679.

office, with the fingerprints on file in this office of . . . Oscar A. White, Army service number RA 16269591 (changed from RA 19392287), who enlisted 19 December 1950 for a period of three years at Butte, Montana, and Oscar A. White, RA 16269591 (changed from RA 18407391), who enlisted 25 October 1951, for a period of three years at Tulsa, Oklahoma, photostatic copies of all of which are attached, and that the fingerprints are those of one and the same person."

The defense now contends that the custodian of public records may certify the correctness of copies thereof, but he cannot state facts explanatory of, or collateral to, such records, nor can he include in such a certificate more than he could testify to if he were present in court. It is argued that these limitations were exceeded in this instance and the certificate should not have been received in evidence.

Generally, copies of official records, on file in a public office, are admissible in evidence upon certification of their completeness and correctness by the custodian, without other identification or authentication. McVeigh v. State, 205 Ga 326, 53 SE2d 462. This exception to the hearsay rule is founded upon expediency, for otherwise many public officials would be required to devote the greater part of their time to attending court as witnesses. Wigmore, Evidence, 3d ed, § 1631. As originally formulated, the rule permitted the certification of the entire and literal terms of the original records, but the custodian was not permitted to certify the substance or effect thereof. State v. Schaller, 111 Ind App 128, 40 NE2d 976. Under the modern view of the rule, however, the use of certificates as to the effect of a document has been widely sanctioned by statute. Thus, under a Massachusetts statute, an analyst of the Department of Public Health may certify the alcoholic content of a liquid. General Law of Massachusetts, Ch 138, § 55; Commonwealth v. Slavski, 245 Mass 405, 140 NE 465. In New York the custodian of fingerprint records may certify that certain finger-prints annexed to such certificate are those of a person whose fingerprints are on file in his office. New York Code of Criminal Procedure, § 482-b; People v. Reese, 258 NY 89, 179 NE 305, 79 ALR 1329. Numerous other examples of similar statutes are set forth in Wigmore, supra, section 1678, note 2. The Manual for Courts-Martial, supra, paragraph 143a, provides for certificates of identity based upon fingerprint comparison, in the following language:

"A certificate by the chief custodian of the personnel records of the armed force concerned, or by one of his deputies or assistants, that a duly qualified fingerprint expert on duty as such in his office has compared certain attached fingerprints with the fingerprints on file of a person described by name, military status, and service number, and that the attached fingerprints and the fingerprints with which they were compared have been found to be those of one and the same person, is admissible to establish, prima facie, the identity and military status of the person whose fingerprints are attached. . . . The attached fingerprints (those which had been forwarded for the purpose of comparison) may be identified as those of a particular individual by the testimony of the person who took them or by someone who was present at the time they were taken."

The procedure followed in the instant case conformed to the above-quoted provisions of the Manual. While it is true that the rules of evidence generally recognize by Federal district courts do not permit the use of a certificate of the scope provided for by the Manual, this is not fatal. In this particular, Article 36 of the Code, supra, 50 USC § 611, provides:

"(a). The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he deems practicable, apply the principles of law and the rules of evidence generally recognized in the

trial of criminal cases in the United States district courts, but which shall not be contrary to or inconsistent with this code."

The provisions of paragraph 143*a*, of the Manual, quoted above, do not conflict with the Code. Accordingly, we cannot declare these provisions inoperative or illegal in the absence of a clear showing that the discretionary powers vested in the President by Article 36 were exceeded. There is no such abuse of discretion here.

Fingerprint evidence has long been accepted as a valid and compelling means of identification. The comparison of one print with another does not depend in general upon variable considerations, such as the speed of perception, retentiveness of memory, surmises, or conjectures. Rather, the determination of the characteristics of an individual fingerprint, and its comparison with others, is accomplished under well-established scientific processes. This method of identification is particularly important in the military service because of the large number of military personnel, their widespread diffusion, and the absolute necessity of ascertaining with certainty the identification of each member. Furthermore, because fingerprint experts are generally unavailable in the areas where courts-martial are usually conducted, particularly during hostilities, some means of making their testimony available is mandatory. The procedure outlined in paragraph 143*a* of the Manual requires that the comparison be made by an expert at the one place where all military records of this type are kept. It further provides for certification of the relevant facts by the custodian of the records. Finally, the certificate is designated only as prima facie evidence of identity. Thus, the accused is left free to rebut this evidence in any appropriate way, and, for the purpose of cross-examination, may either compel the attendance of the expert, whose comparison forms the basis of the certificate, or he may secure such testimony by deposition.

For the above reasons, the Manual

provision is controlling, and no error resulted from the receipt in evidence of the certificate of identity.

The fact and duration of the accused's unauthorized absence were conclusively established by the accused's plea of guilty to absence without leave as a lesser included offense of desertion. Whether the accused intended to remain absent permanently and whether the absence was terminated by apprehension were the only issues presented to the court-martial under this charge. Bearing upon both of these matters was a stipulation entered into by the parties, and received in evidence at the trial. This stipulation was as follows:

"... [I]f Mr. Jack C. Martin, Sheriff of Casper, Wyoming, were present in court, he would testify under oath as follows: That at approximately 0100 hours on 9 September 1952, he was called to investigate a disturbance at the 114 Club in Casper, Wyoming. Upon arriving at the 114 Club, he took Oscar A. White into custody for being drunk and disorderly. That at that time Oscar A. White informed him that he was absent without leave from the US Army. That he then placed Oscar A. White in the county jail where he remained until 24 September 1952, when he was released to the military authorities. That at the time of his apprehension, Oscar A White was dressed in civilian clothing."

The defense argues that this stipulation, which was the only evidence of the circumstances under which the accused's absence was terminated, is insufficient to establish termination by apprehension. This contention is supported, it is urged, by our decision in United States v. Nickaboine, 3 USCMA 152, 11 CMR 152. In that case the stipulation in question showed only that the accused therein volunteered the information that he was a member of the military service, after he was involved in an automobile accident. The facts of the case at bar are clearly distinguishable from the situation which confronted us in the Nickaboine case.

670

There the stipulation did not even suggest that the accused was under arrest, nor could it be reasonably concluded that he revealed his identity as a member of the armed forces solely to avoid prosecution or other action by the civilian authorities. In the instant case, the stipulation shows conclusively that the accused was arrested because he was drunk and disorderly, and revealed his military status while held under this charge. The probable inference to be drawn from this disclosure, considering all the circumstances, is that it was made for the sole purpose of avoiding prosecution by civilian authorities. This inference remained unrebutted for the accused neither testified in his own behalf, nor did he offer any evidence in defense. The evidence is legally sufficient to sustain the finding that the desertion was terminated by apprehension as alleged.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.