UNITED STATES, Appellant

v.

WILLIAM F. FISHER, Private E–2, U. S. Army, Appellee

4 USCMA 152, 15 CMR 152

No. 3318

Decided April 9, 1954

Lt Col William R. Ward, U. S. Army, and Maj Irvin M. Kent, U. S. Army, for Appellant.

Capt William C. Irby, Jr., U. S. Army, and 1st Lt Leslie D. Scharf, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

A general court-martial in Korea convicted the accused, and another, of several offenses, in violation of the Uniform Code of Military Justice. He was sentenced to a dishonorable discharge, total forfeitures, and confine-ment at hard labor for five years. The convening authority approved the find-ings of guilty and the sentence, but a board of review set aside the findings on one of the charges as they affected the accused. The board of review held that a pretrial statement of the accused

was improperly admitted into evidence and that the error required reversal of the charge to which the statement related. The Acting The Judge Advocate General certified to this Court the following question:

"Under the circumstances, did the fact that the evidence failed to show whether accused's extra-judicial statement had been made without prior warning under Article 31, Uniform Code of Military Justice, require the law officer on his own motion without objection or suggestion from the defense to instruct the members of the court-martial not to consider the statement?"

About midnight on March 4, 1953, in the village of Chon Jon Ri, two American soldiers, armed with guns and wearing pile caps, with the letters "MP" marked in white on the visors, entered the room of Lee Kap Soon. Present with Miss Lee was a group of her friends, including Pak Yun Sik, a Second Lieutenant in the South Korean Army. The soldiers identified themselves as military policemen. One of them picked up a cigarette lighter from the floor. Pak Yun Sik informed him that the lighter was his, and sought to reclaim it. His efforts were repulsed. When it was observed that he was wearing a pistol, this too, was taken from him. Pak Yun Sik sought to remonstrate further but he was hit on the nose by the accused. A short time later Master Sergeant Janka and Sergeant Smith, military police on patrol in the vicinity, were informed of the events. They were advised as to the accused's route of departure and entered into the pursuit. This led through a rice paddy. Approximately 700 yards outside the village, two persons were seen in the distance. One of these called out, "Hold it, we see you," and a barrage of shots was fired at the military police. Some of the shots came "pretty darn close" to hitting Sergeant Janka. Janka called out he was a military policeman, but the firing continued. When it stopped, Janka, and a number of other policemen who appeared on the scene, closed in on the spot from which the shots had come, but they found no one there. Having reason to believe that the assailants were members of a nearby engineering company, Janka proceeded to that organization's area.

Aided by the sergeant of the guard at the company compound, Janka approached a tent, and found the accused outside with a carbine in his hands. Janka took the weapon from the accused and smelled it. It seemed to him that it had "just been fired." After some preliminary cross-examination by defense counsel into Janka's ability to distinguish between the smell of gunpowder and gun oil, the following appears in the record:

"Q. After you smelled the weapon, what did you do?

A. I handed the weapon to Sergeant Smith—No, first, I made the remark to Private Fisher, 'You've been out in the field doing some firing, haven't you?' He said, 'No, I haven't.' I said, 'When did you fire the weapon, then?' He said, 'I heard the shots, so I stepped out and fired a shot out there, too.' I said, 'All right,' and I handed the weapon to Sergeant Smith and told Private Fisher he was under arrest. I handed Smith my carbine, also, and stepped to the right by the back— or front of the tent by the door of the tent, and stepped inside to look for the second man. As I stepped inside the tent, I came upon Private Holcomb standing right inside the door. There were several other people there. I don't know who they were; I didn't pay any particular attention to them. But, on Private Holcomb, I noticed mud all over him. I said, 'You look —' "

At the trial, defense counsel did not object to Janka's testimony regarding his conversation with the accused. However, the board of review held that the statement was admitted in evidence in violation of the accused's rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. It concluded that the statement related to the charge of aggravated assault and that reversal was required of the findings of guilty of that offense.

In this case we are squarely faced with this question, did the accused's

failure at the trial to object to the admission, or otherwise request the exclusion, of a pretrial statement taken from him without warning him of his rights under Article 31(b), preclude consideration of this allegation of error on appeal to this Court? In United States v. Monge, 1 USCMA 95, 2 CMR 1, our first case on the subject, we pointed out that the statutory requirement of warning was related to the privilege against self incrimination. Later, in conformity with the settled Federal practice, we held that the privilege itself could properly be waived. United States v. Welch, 1 USCMA 402, 407, 3 CMR 136; United States v. Dupree, 1 USCMA 665, 5 CMR 93. In the Federal criminal courts, the general rule is that if an accused fails to object to evidence obtained in violation of his right against self incrimination, the error will not be preserved for later review. Cravens v. United States, 62 F2d 261, 273, (CA8th Cir 1933), cert den 289 US 733, 77 L ed 1481, 53 S Ct 523; Optner v. United States, 13 F2d 11 (CA6th Cir 1926); Shaw v. United States, 180 Fed 348, 355 (CA6th Cir 1910); Graham v. Squier, 45 F Supp 253, aff'd 132 F2d 681 (CA9th Cir 1942), cert den 318 US 777, 87 L ed 1145, 63 S Ct 1158. See also United States Ex rel. Vajtauer v. Commissioner of Immigration, 273 US 103, 71 L ed 560, 47 S Ct 302; United States v. Johnson, 76 F Supp 538 (DC Pa 1947). The accused here argues that our decision in United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48, demands a different application of the rule in the military courts.

In the Wilson case, the accused admitted that he "shot at the man" in response to a question asked of him by a military police sergeant, who was then inquiring into a homicide that had just been committed. The military police did not inform the accused of his rights under Article 31, Uniform Code of Military Justice, supra, before the questioning. We held that the statement was obtained from the accused in violation of the clear mandate of Article 31, and that the error in its admission in evidence must be regarded as "inherently prejudicial." Although not recited in our opinion, the record shows that defense counsel did not object to the admission in evidence of the extrajudicial statement. For that reason, the accused urges that we notice the error in this case, and reverse on the same ground. However, in the Wilson case we did not intend to establish a military practice in this area different from that in the Federal criminal courts.

The Wilson case came to us on mandatory review of a death sentence in a murder case under Article 67(b) (1), Uniform Code of Military Justice, 50 USC § 654. A serious question was presented as to the sufficiency of the evidence, and the accused's pretrial statement had an important bearing upon that issue. At three different places in our opinion, we emphasized that relationship. Ibid, 255, 256, 257. Moreover, the failure to object was closely connected to a substantial claim of incompetence on the part of defense counsel. Manifestly, if the accused was to be accorded a fair trial, the error in the admission of the accused's pretrial statement was error of the kind and importance which demanded our attention, in spite of the absence of objection at the trial level. See Dupree, supra; United States v. Masusock, 1 USCMA 32, 1 CMR 32; Suhay v. United States, 95 F2d 890 (CA10th Cir 1938), cert den 304 US 580, 82 L ed 1543, 58 S Ct 1060.

The circumstances in this case differ greatly from those in Wilson. For instance, it is immediately apparent that the extrajudicial statement here is not exclusively incriminatory. Reasonably, it is exculpatory in that part which attempts to explain away the otherwise incriminating fact that the smell of powder about the accused's weapon indicated that it had "just been fired." That part of the statement is the only evidence in the record which could give an innocent meaning to the powder smell. It is significant, too, that before Janka testified to his conversation with the accused, defense counsel cross-examined him for the evident purpose of eliciting an admission that he might have mistaken a smell of oil for that of powder. The effort failed. On that

state of the record, it may well be that the defense wanted the statement in evidence for whatever benefit he could derive from it. The accused was represented not only by regularly appointed defense counsel, but by special individual counsel. Both of them took an active part in the trial proceedings, even to the extent of cross-examining the same witness, but neither objected to the pretrial statements.

Unlike the Wilson case, the pretrial statement itself had little bearing on the ultimate issue of guilt or innocence. Lt. Pak Yun Sik was unshaken in his testimony identifying the accused and his companion as the persons who robbed him of his lighter and pistol. He also was equally firm in identifying, as his own, the pistol taken from the accused's companion at the time of their apprehension. Other evidence which need not be detailed, tied a tight knot in the identification of the accused and his companion as the perpetrators of the offenses charged.

On this record, we conclude that the accused's failure to object to the admission of the pretrial statements obtained from him without the warning required by Article 31, precludes him from urging the error on appeal as a ground for reversal. However, we wish to make it clear that this rule is not inflexible. Certainly, we will consider error in the admission of a pretrial statement obtained in violation of Article 31, even in the absence of objection or a motion to strike, if the error results in depriving the accused of a fair trial or produces a manifest miscarriage of justice. That was what we did in the Wilson case. See also: United States v. Smith, 2 USCMA 121, 6 CMR 121; United States v. Dupree, supra; United States v. Masusock, supra.

As human beings we can hardly expect to attain *perfect* justice because this is a *Divine* accomplishment. But we can do *substantial* justice in every case and this is our major objective; and let us make it crystal clear—or at least as clear as our powers of expression will permit—that, whenever, to do substantial justice, it becomes necessary to notice an error, then objection or no objection, as far as we are concerned that error will be noted.

For the foregoing reasons, we answer the certified question in the negative. The decision of the board of review is reversed, and the case is returned to The Judge Advocate General for resubmission to a board of review for action not inconsistent with this opinion.

LATIMER, Judge (concurring in the result) :

I concur in the result.

The Chief Judge's opinion announces a rule which is one this Court has either refused to follow, or announce clearly, in previously decided cases. It has long been recognized by the Federal civilian courts and has been incorporated in the Federal Rules of Criminal Procedure. It should become part of military law as it makes for orderly procedure without denying an accused a fair and just trial. However, having embraced the principle, we should make it crystal clear that, regardless of past decisions, we will enforce the Federal civilian rule in cases involving failure to object to the admission of evidence. By adopting the doctrine, we have made a wealth of good civilian authority available to courts-martial and boards of review for their future guidance.

I pen this short concurrence because I am convinced that United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48, United States v. Pedersen, 2 USCMA 263, 8 CMR 63, and other cases, have been interpreted, and with good reason, not to embrace the Federal civilian doctrine.

BROSMAN, Judge (concurring in the result) :

I have no difficulty at all in concurring in the result reached by the majority in this case, although I cannot under any circumstances accept the broad ground on which it is based.

The effort in the principal opinion to distinguish Wilson and Harvey serves to demonstrate, rather than to conceal, the regrettable fact that, in at least one of its critical aspects, that

landmark case has been repudiated. This, I think, is a sad mistake. In speaking of an earlier example of the sapping process found at work in the instant case, I used the following language: "I am much afraid that the attitude this approach reflects will lead inexorably to a future course of decision based almost wholly on a theory of waiver." United States v. Smith, 2 USCMA 440, 9 CMR 70. The reader may be assured that I derive scant satisfaction from the present evidence of accuracy of the melancholy prophesy offered in Smith. It is obvious to me that the action of the majority here constitutes an explicit surrender of an important aspect of the function of this Court.

I am told that the broad principle of waiver laid down by the majority will serve to bring the practice of this Court on the point into accord with that set out in the Federal Rules of Criminal Procedure. This—I must confess —is a matter of comparative indifference to me. However proper within their sphere, the Rules were in no sense drafted with an eye to court-martial proceedings. Moreover, the traditional attitude of military law toward the concept of waiver is the exact antithesis of that proposed by my brothers here. Our job, as I see it, is to administer the Uniform Code of Military Justice, and—where free to do so—to select from the Federal Rules *and other sources* those principles, practices, standards, and attitudes which we deem appropriate to *military —as distinguished from civilian—law administration*. A full expression of my views on the place of waiver in the military justice scene will be found in a separate opinion in United States v. Smith, supra.

There can be no doubt that—in other opinions—my brothers have not hesitated in what they deemed proper cases to depart from the precepts of the Federal Rules of Criminal Procedure. All of us, I think, feel entirely free to select—in instances where it is open to us to choose. We simply disagree on occasion as to the source of the desirable military rule. Let us not, there-

fore, make a fetish of adherence to the Federal Rules in this instance.

## II

My willingness to agree with the majority in their disposition of this case stems from my complete certainty that we have before us here a case squarely within United States v. Seymour, 3 USCMA 401, 12 CMR 157, and United States v. Josey, 3 USCMA 767, 14 CMR 185. The record in the instant case is as silent as the tomb on the question of whether an Article 31 warning was given the accused. While it does not affirmatively appear that such a warning was accorded him, neither does it appear that one was not. Therefore, we do not find that "clear case" calling for an invocation of the doctrine of general prejudice demanded in Josey, nor that suggestion of involuntariness contemplated by us in Seymour.

## III

It is even probable that we have here a waiver in the historic, true, and precise sense—that envisaged by the current Manual in paragraph 154d, at page 297. Of course, this is to be distinguished sharply from the "constructive" or "administrative" waiver in the minds of my brothers. Viewed from one standpoint, the statement of the accused under scrutiny here was distinctly inculpatory in character. Yet considered from another, it clearly denied guilt. Although the Government offered it in evidence, and appeared to regard it as inculpating the appellant, is it not possible that—because of its exculpatory aspect—the defense knowingly and deliberately chose to let it in?

If this was the case, then we have a waiver in *my* language, for there—in the phrasing of the Manual, supra—"it [would] clearly . . . [appear] that the defense . . . understood its right to object" and made an informed choice. It must not be forgotten that the Manual also provides explicitly that "a mere failure to object does *not* amount to a waiver except as otherwise stated or indicated in this manual." (Emphasis supplied.) But I need not rely on this ground—for, under my view, we do not reach the question of waiver. It can-

not be denied, however, that the ratio of the majority in the case at bar flies in the very teeth of the Manual directive quoted earlier in this paragraph. Courts are required to decide cases, and must ever act to fill a legislative hiatus. However, an instance of judicial legislation in the face of the specific terms of positive law is quite another thing— and an indefensible and shocking one. This Court has repeatedly stated—and with unqualified unanimity—that it is bound by the dictates of the Manual in the absence of conflict with the Uniform Code. See e.g. United States v. Lucas, 1 USCMA 19, 1 CMR 19; United States v. Sonnenschein, 1 USCMA 64, 1 CMR 64; United States v. Hemp, 1 USCMA 280, 3 CMR 14; United States v. White, 3 USCMA 666, 14 CMR 84; United States v. Greer, 3 USCMA 576, 13 CMR 132.