UNITED STATES, Appellee

v

GEORGE T. FIELDS, Private, U. S. Army, Appellant

13 USCMA 193, 32 CMR 193

No. 15,738

July 20, 1962

*First Lieutenant Thomas Stapleton* argued the cause for Appellant, Accused. With him on the brief was *Captain Ralph T. Smith.*

*First Lieutenant Charles D. Reaves* argued the cause for Appellee, United States. With him on the brief was *Major Francis M. Cooper* and *Captain Barry L. Kroll.*

## Opinion of the Court

QUINN, Chief Judge:

At his trial before a general court-martial at Fort Jay, New York, the accused pleaded guilty to a charge of unauthorized absence; and to a specification of desertion, he pleaded guilty to unauthorized absence for the period alleged, but not guilty to the allegations that he intended to remain away permanently and that he was "apprehended." The court-martial found the accused guilty as charged, and imposed a sentence on the basis of the greater sentence authorized for desertion "terminated by apprehension." See Manual for Courts-Martial, United States, 1951, Table of Maximum Punishments, paragraph 127c, Section A, page 220; United States v Nickaboine, 3 USCMA 152, 11 CMR 152. On this

194

appeal, the accused contends the evidence is not legally sufficient to support the finding and that the law officer's instructions on the issue were incorrect.

We consider first the sufficiency question. On May 14, 1961, Francis Hopkins, a New York City Patrolman, observed a car turn against the traffic control signal at the intersection of 42d Street and 8th Avenue in the Borough of Manhattan. He stopped the vehicle. The accused was the driver. Officer Hopkins noticed there was no key in the ignition switch. When asked about the ownership, the accused admitted to the police officer the vehicle was "just stolen." Hopkins immediately took the accused into custody and brought him to a police station on 54th Street. Presented to the desk officer and asked to identify himself, the accused gave his name, his home address in McKeesport, Pennsylvania, and said he was in the Army. "At that point," the accused was asked for a pass or leave orders. He then admitted he was absent without authority from his unit at Fort Leonard Wood, Missouri. From Officer Hopkins' testimony it appears inferentially that military police were stationed in the precinct building, and that they were notified of the accused's apprehension. Two military policemen came to the interrogation room where the accused was being questioned within thirty-five minutes of notification. In the meantime, the accused had told the civilian police officers he was "glad that he was taken into custody," and he "wanted to get things straightened out with the Army." He also said he had had certain "problems" at Fort Leonard Wood, and he wanted to "explain" these to Army Officers.

Before his trial by court-martial for his military offenses, the accused was tried and convicted in a civilian court for theft of the automobile. He was sentenced to "three months . . . [at] Rikers Island," a civilian confinement facility. Prosecution Exhibit 1, a morning report extract, indicates the accused was "App Civ Auth 1215 hrs 14 May 61" but was carried on the rolls of the reporting organization as absent "in hands civ auth House of Detention Brooklyn NY." A second entry, dated July 28, shows the accused's status was changed from confinement by the civilian authorities to confinement at Fort Jay.

There is no indication that a formal detainer was placed against the accused by the military. At trial, the parties proceeded on the theory the circumstances of the apprehension on May 14 by Officer Hopkins defined the nature of the termination of the accused's unauthorized absence on July 28. On that theory the morning report entry might be sufficient by itself to support the finding of apprehension, even though the accused's physical return to military control was not effected because he was held by the civil authorities for trial and punishment for the civilian offense.[1] See United States v Simone, 6 USCMA 146, 19 CMR 272. Whether the entry is sufficient, however, need not detain us. It is appropriate, under the circumstances of the case, to test the sufficiency of the evidence according to the theory upon which the case was tried and argued by both parties. See United States v Justice, 13 USCMA 31, 32 CMR 31, footnote 3; cf. United States v Deller, 3 USCMA 409, 12 CMR 165.

The accused contends the word "apprehension" as a basis for increased punishment applies to only two situations. The first is where the accused is "actually picked up [for desertion] by the military authorities or by the civilian authorities on behalf of the military." See Articles 7 and 8, Uniform Code of Military Justice, 10 USC §§ 807, 808. The second is where the accused is apprehended by civil authorities for a civil offense and reveals his military status "for the sole purpose of avoiding prosecution for the civil offense by the civilian authorities." See

---

[1] Since the accused's confinement by the civil authorities was attributable to his own misconduct, the period of that confinement was properly charged as part of the unauthorized absence. United States v Grover, 10 USCMA 91, 94, 27 CMR 165.

United States v Nickaboine, supra; United States v White, 3 USCMA 666, 14 CMR 84. Continuing his argument, the accused maintains that the first situation is manifestly not present here; and as to the second, the credible evidence compellingly shows the accused disclosed his military status, not to escape civilian prosecution, but to establish "contact" with the military authorities. The argument is based upon too narrow a reading of the Manual's punishment provision.

In the *Nickaboine* case we reviewed the background of the phrase "terminated by apprehension," as used in the Table of Maximum Punishments. We held that "apprehension" contemplates termination of the accused's absence in an involuntary manner; and "termination otherwise" is an absence ended "freely and voluntarily." In other words, the Manual provision does not differentiate between these two classes of termination by means of particular situations, but rather by way of a broad definition for each category.

Tested by the *Nickaboine* construction of the meaning of the Manual provision, there is clearly substantial evidence to support the court-martial's finding of apprehension. The court-martial could reasonably find the accused's absence was terminated, not by his own willing act, but "under the compulsions" of his arrest for car theft. United States v Nickaboine, supra, page 156. He disclosed his status as an unauthorized absentee only in the course of the civilian police inquiry into his identity. His remark that he was "glad" he was in custody indicates he expected his arrest by the civilian police to lead directly to "contact" with the military. True, he testified that when he revealed his military status he "didn't think about" avoiding civilian prosecution for stealing the car, but the court-martial was free to disregard this testimony, and to conclude from the other evidence that he did have that purpose in mind. See United States v Babb, 6 USCMA 191, 19 CMR 317. Apart from whether it believed or dis-

believed the accused's testimony, the court-martial could find beyond a reasonable doubt from all the evidence that the absence was terminated by "events and agencies wholly beyond . . . [the accused's] control," which is termination by "apprehension" within the Manual provision. United States v Simone, supra; see also United States v White, supra.

Turning to the instructions on apprehension, the accused contends they are so misleading as to be prejudicial. With material parts separately numbered for convenience, the instructions are as follows:

"[1] The term 'Apprehension' as used in the specification imports that the accused's return to military control was involuntary. [2] It must be shown that neither the accused nor persons acting at his request initiated his return.

"[3] The fact that the accused was apprehended by civilian authorities, for a civilian violation, and was thereafter turned over to military control by the civilian authorities, is not conclusive proof that the accused's return was involuntary. Such return maybe [sic] deemed involuntary if after the accused was apprehended, such civilian authorities learned of the accused's military status from someone other than him or persons acting at his request. [4] In addition the return maybe [sic] involuntary if after being apprehended by civilian authorities the accused disclosed his identity as a result of a desire to avoid trial, prosecution, punishment or other criminal action at the hands of such civilian authorities. However, if the accused disclosed his identity to the civilian authorities, because of his desire to return to military control, his return should not be deemed involuntary or by apprehension. . . .

· · · · ·

"The arrest of an accused by civilian authorities does not, in absence of special circumstances, terminate his unauthorized absence by apprehension where the record does not show such apprehension to have

196

been connected with or done on behalf of the military authorities. Thus, in absence of special circumstances, mere apprehension by civilian authorities does not sustain the burden of showing that the return to military control was involuntary."

The first and second statements paraphrase language from our opinion in the *Simone* case, supra. ■■■■ ■ We there indicated that ■■■■ ■ apprehension is established by evidence showing "a return of the accused to military control uninitiated by him or by another acting at his request." Supra, page 150. Opinion language may not always be suitable in an instruction to a court-martial, but here the statements provide a correct and appropriate definition for determining whether the accused's absence was terminated by "apprehension." United States v Nickaboine, supra. Except for the words "conclusive proof," the accused does not dispute the correctness of the third statement. The questionable words may be inappropriate. United States v Cotton, 13 USCMA 176, 32 CMR 176. However, in our opinion, the reasonable import of the whole instruction is to the effect that apprehension by civil authorities may be considered as evidence of termination of absence by apprehension only "if after . . . [apprehension] such civilian authorities learned of the accused's military status from someone other than . . . [the accused] or persons acting at his request" or from the accused "as a result of a desire to avoid . . . criminal action at the hands of such civilian authorities." Moreover, the court-martial was specifically instructed that "mere apprehension by civilian authorities" did not show the accused's return was involuntary, that is, "apprehension" in the sense used in the specification of the charge. Disclosure of the accused's military status under either of the circumstances set out in the instruction above may properly be considered by the court-martial as evidence of termination of accused's absence by "apprehension." United States v White, supra; United States v Babb, supra; United States v Simone, supra. Con-

sequently, while use of the words "conclusive proof" may be inartful, the principles of law delineated in statements [3] and [4] are correct, and directly applicable to the specific question of fact to be decided by the court-martial. Accordingly, we find no error which presents a fair risk that the court-martial was misinformed.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

With all respect, I cannot agree with my brothers that the evidence is sufficient to sustain so much of the findings of guilty as establish that accused's desertion, in violation of Uniform Code of Military Justice, Article 85, 10 USC § 885, was terminated by apprehension, or that the law officer's instructions in this area were proper. True it is that the latter were firmly grounded on our prior holdings, but the time has come to re-examine these decisions, and I believe that any real scrutiny of the issue they purport to settle will demonstrate the fallacy inherent in the conclusion which they have heretofore compelled. In short, despite its importance to the administration of criminal law, the doctrine of *stare decisis* should not be perverted into a judicial cloak for the perpetuation of erroneous principles. United States v Jacoby, 11 USCMA 428, 29 CMR 244; Helvering v Hallock, 309 US 106, 84 L ed 604, 60 S Ct 444 (1940).

Turning to the evidence before the court-martial, it reveals that the accused's vehicle was stopped for a traffic offense by a New York police officer on May 14, 1961. The officer became suspicious when he noticed there was no key in the ignition and asked for the automobile's registration papers. Accused blurted out that he had just stolen the car. The officer took accused into custody and transported him to a police station.

There, accused was told to empty his pockets and to identify himself. Ac-

cused complied and stated he was an Army private, producing his identification card. Asked to show authority for his absence, accused replied that he was absent without leave from Fort Leonard Wood. He added that he was happy to be arrested, as he could now inform the Army concerning the circumstances surrounding alleged discrimination against him at his post.

Military police, notified of accused's detention, soon arrived. Accused was not released to their control in view of the automobile theft. Ultimately, a New York court tried him for this offense and sentenced him to confinement for three months. After serving a portion of this sentence, he was released to the military authorities. As noted above, he was thereafter brought to trial and found guilty of desertion, terminated by apprehension on July 28, 1961, the date on which he was actually returned to military control.

The law officer instructed the court-martial *inter alia*, that it might find accused was "apprehended" unless the accused, or someone acting on his behalf, initiated his return, or if it determined that he was taken into custody by civil authorities for an offense against local law and, after being so arrested, "accused disclosed his identity as a result of a desire to avoid trial, prosecution, punishment or other criminal action at the hands of such civilian authorities," rather than "because of his desire to return to military control."

Regardless of how the issues are framed, the accuracy of these instructions are the crux of accused's contentions before us. If they properly state the law, it is obvious that the evidence is sufficient to permit the inference that his absence, with the appropriate intent, was terminated by "apprehension." And it cannot be doubted that the advice is fully supported by our decisions in United States v Nickaboine, 3 USCMA 152, 11 CMR 152; United States v White, 3 USCMA 666, 14 CMR 84; and United States v Babb, 6 USCMA 191, 19 CMR 317.

It is, however, with our former uncritical approval of these instructions that I disagree, for I believe we failed to give sufficient weight to a substantial change in military law worked under the Uniform Code and the Manual for Courts-Martial, United States, 1951, and too much prominence to an early opinion of The Judge Advocate General of the Army. I propose, therefore, to demonstrate wherein our reasoning went astray.

Undoubtedly, the President has the authority to prescribe in the Manual, supra, a maximum limit upon the punishment for a violation of Code, supra, Article 85. Code, supra, Article 56, 10 USC § 856; United States v Varnadore, 9 USCMA 471, 26 CMR 251; United States v Holt, 9 USCMA 476, 26 CMR 256; United States v White, 12 USCMA 599, 31 CMR 185. And, in prescribing a maximum limitation, he may, upon a reasonable basis, distinguish between punishments for such a violation, according to the circumstances under which it was committed. Cf. United States v Culley, 12 USCMA 704, 31 CMR 290.

The President has thus prescribed a Table of Maximum Punishments for various offenses under the Code in paragraph 127c of the Manual, supra. With respect to the offense of desertion, it provides:

| Article | Offenses | Punishments | | | | |
|---|---|---|---|---|---|---|
| | | Dishonorable discharge, forfeiture of all pay and allowances | | Confinement at hard labor not to exceed | | |
| | | | | Years | Months | Days |
| 85 | **Desertion:**<br>Terminated by apprehension<br>Terminated otherwise | Yes<br>Yes | | 3<br>2 | | |

In United States v Nickaboine, supra, we were first confronted with the problem of interpreting the phrase "Terminated by apprehension," as used in the quoted section of the Table, supra. In that case, it was stipulated that Private Nickaboine was "apprehended" by a civilian police officer when he became involved in an automobile accident. Accused "volunteered" the information that he was in the Army. Subsequently, he was returned to military control, tried, and convicted of desertion terminated by apprehension. A majority of the Court stated that the manner in which a desertion was terminated must be alleged in the specification, covered in the instructions, and established beyond a reasonable doubt by the evidence. Finding the evidence of Nickaboine's apprehension equivocal, it set aside the findings of guilty in part and returned the case to the board of review. Nevertheless, the late Judge Brosman, writing on behalf of the Court, construed the above entry in the Table, i. e., "Terminated otherwise," to have the same meaning as the phrase "Terminated by surrender" which appeared at the same place in prior editions of the Manual. While he did not set out the rationale leading him to this conclusion, Judge Latimer, concurring in the result, expressed the view that it was compelled by the definition of "apprehension" adopted by Army boards of review prior to enactment of the Code. Thus, he stated, at page 157:

"There is no definition of apprehension in the present Manual and so the best information available, in service authorities, is found in Digest of Opinions of The Judge Advocate General of the Army, 1912–1940, section 416(15), June 22, 1932. In that opinion it is stated:

'For purposes of determining the measure of punishment to be given in cases of desertion the rule may be followed if the accused initiates his return to military control by surrendering to the civil authorities or to military authorities, the desertion is terminated by surrender, but, if disclosure of his identity to the civil officers is impelled by the fact that they have apprehended him for vagrancy or on any other charge and are questioning him or about to question him, or bring him to trial before one of the minor magistrates, the return to military control is not voluntary but is caused by a desire to escape criminal action on the part of civil authorities. . . .' "

In United States v White, 3 USCMA 666, 14 CMR 84, supra, a unanimous Court adopted the reasoning set forth by Judge Latimer in *Nickaboine,* supra. Finding the evidence revealed accused disclosed his identity as an absent soldier only after being arrested for a minor offense, it declared at page 671:

". . . The probable inference to be drawn from this disclosure, considering all the circumstances, is that it was made for the sole purpose of avoiding prosecution by civilian authorities."

The concept thus announced by the Court was speedily embodied in instructions to the fact finders and subsequently approved on appellate review. United States v Babb, supra. Examination of the correctness of the principle so adopted by the Court requires that we compare the provisions of the present Manual with those of its predecessors which thus led to the development of the doctrine.

The Articles of War, with respect to the offense of desertion in time of peace, simply authorized "any punishment, except death, that a court-martial may direct." Article of War 58, 10 USC (1946 ed, Supp IV) § 1530. In a manner similar to the Code, however, the President was authorized by Congress to prescribe maximum limitations on the discretion of a court-martial so to penalize an accused. Article of War 45, 10 USC, supra, § 1517. Pursuant to the legislative authority delegated to him, the President promulgated a Table of Maximum Punishments in paragraph 104c of the Manual for Courts-Martial, U. S. Army, 1928. Concerning the offense of desertion, it divided the permissible penalties according to whether the accused's unauthorized absence was "Terminated by apprehension" or was "Terminated by surrender."[1] These provisions continued in effect until publication of the Manual for Courts-Martial, U. S. Army, 1949, pursuant to Executive Order No. 10020, December 7, 1948, implementing various amendments to the Articles of War contained in the Act of June 24, 1948, 62 Stat 627. This new Manual, however, effected no change in the pertinent provisions of the Table of Maximum Punishments. It continued to classify the penalty for desertion according to whether it was terminated by "apprehension" or by "surrender." Manual for Courts-Martial, 1949, supra, paragraph 117c.

The provisions of the 1928 Manual were apparently first construed by The Judge Advocate General, United States Army. As noted by Judge Latimer in the *Nickaboine* case, supra, he opined that a period of desertion was ended by "apprehension" if the accused made known his identity after arrest by civil authorities only because of a desire to avoid civil prosecution. JAG 251.22, June 22, 1932, Digest of Opinions of The Judge Advocate General of the Army, 1912–40, § 416(15). There is no indication that Army boards of review adopted the position thus set forth. Operating under the provisions of the 1949 Manual, however, the separate tribunals of the Air Force at least recognized the principle by quoting from the Digest of Opinions, supra. It is significant, however, that in each such case, evidence of a civil arrest, subsequent disclosure of identity, and release to military control were held insufficient to establish termination by apprehension. United States v Cooper, 4 CMR (AF) 700; United States v Cox, 4 CMR (AF) 73; United States v Trejo, 2 CMR (AF) 591.

In sum, then, what we appear to have done in *Nickaboine,* supra, is to have based our unusual definition of "apprehension" solely on an administrative opinion of The Judge Advocate General concerning a factual situation which did not precisely fit the phrasing of the Table of Maximum Punishments then in effect, and which was not adopted nor given effect by any judicial body in the armed forces prior to the effective date of the Code. Moreover, this was done without regard to the fact that

---

[1] Under each such division, the punishment was also varied according to the length of the accused's service. This consideration, however, is not pertinent to the problem before us.

both the Code and the 1951 Manual provide explicit definitions of "apprehension" and made a substantial change in the phrasing of the new Table of Maximum Punishments.

Code, supra, Article 7, 10 USC § 807, defines the term "apprehension" as "the taking of a person into custody." Code, supra, Article 8, 10 USC § 808, authorizes civil officers to "summarily apprehend a deserter from the armed forces and deliver him into the custody of those forces." The Manual, supra, embodies the same definition and sets forth the same. power on the part of the civil police. Manual, supra, paragraphs 18a, 23. In addition, the drafters of the 1951 Manual chose to alter the categories of desertion listed in the New Table of Maximum Punishments from "Termination by apprehension" and "Termination by surrender" to continued use of the first phrase and addition of the novel more general classification of "Terminated otherwise." Rather than to indicate a desire to adopt an interpretation of the former language by The Judge Advocate General, it would seem clear that the writers intended thereby to eliminate the difficulty which led to that opinion by providing classifications into which all terminations could logically be placed.

Thus, one who is taken into custody by military or civil authorities for the offense of desertion, pursuant to the powers conferred upon them under Code, supra, Articles 7 and 8, may be said to be "apprehended" in the sense that the Table and the Code use that term. And those who are returned to military control by any other means, whether it be surrender, the result of exhortation by third parties, or, as in this case, arrest by civilian police for a civil offense and subsequent voluntary disclosure of identity, have their absences ended "otherwise."

The Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, does not reveal why the new classifications were adopted, but it does indicate substantial changes were intended to be made in this portion of the Table. Legal and Legislative Basis, supra, page 195. And it cannot be doubted that the term "surrender" was expressly deleted. The effect of our prior decisions, however, is to reverse this change in approach and to reinsert "surrender" as the only factor justifying a lesser maximum sentence. So to act in construing a penal regulation adopted pursuant to statute is to set our collective judgment above that of the President in an area in which he is, pursuant to Congressionally delegated authority, supreme. In short, the fact that the 1951 Manual completely altered the scheme of punishment for desertion is ignored in favor of an attempt by this Court to effect its agreement with The Judge Advocate General that a desertion not terminated by surrender ought to be more severely punished. As the Manual's language clearly does not so provide, the error in these opinions is patent.

Moreover, I cannot attribute to a term statutorily defined as the taking of a person into custody, Code, supra, Article 7, the meaning administratively attributed to it in 1932. I suggest that the real basis for the current Manual's distinction is simply whether it was necessary to locate and arrest the accused for desertion in order to end his absence or whether he initiated his own return. What *motivated* him to follow the latter course is completely immaterial. No human action is ever the product of a completely free will, and much of our behavior might be quite different unless we were compelled to do otherwise by the dictates of our conscience, self-esteem, position in life, relations with our neighbors, or what have you. Thus, the return to military hands of an absentee who discloses his identity to civil authorities after arrest for a local offense is not a whit less "voluntary" than that of a soldier who succumbs to the importunities of his parents, sweetheart, or the fear of severe punishment for a longer absence, and surrenders. Indeed, it is difficult to perceive why anyone would hold an accused's disclosure of military status less free in the one instance than in the other.

**201**

Moreover, such an interpretation of "apprehension" places the accused in the impossible position of having to eliminate an unworthy motive in every instance in which he is arrested for any civil offense, however petty, before disclosing his military identity. Even though he is *en route* back to his station, a thoroughly repentant individual, the military jury is left free to speculate concerning the purely personal factor which led to his confession and to conclude he was apprehended solely because he may have desired military punishment rather than to entrust himself to the untender hands of the civil courts. Indeed, we stated in United States v White, supra, such is. the "probable inference" to be drawn from a disclosure of military status subsequent to arrest. And no matter how worthy the accused's reasons for the revelation may have actually been, we are rendered unable to reject such a conclusion by the fact finders that his return was "involuntary." United States v White, supra; United States v Babb, supra.

When the concept anciently advanced by The Judge Advocate General is thus tested against the anvil of logic, it becomes apparent that accused's motives are immaterial with respect to whether he was "apprehended." His ultimate return to the military service in the one instance is as "voluntary" as in any other case where it has not become necessary to seek him out. The purpose of the amelioration of punishment in the absence of apprehension is obviously designed to encourage voluntary termination of unauthorized absences. We scarcely contribute to this Presidential objective by eliminating any reason for an accused voluntarily to reveal his identity to those having control over him in order that they may arrange for his ultimate release to military custody.

In sum, then, I am of the view that it is necessary to take an accused into custody as an absentee in order to find that he was "apprehended" in the sense of the Table of Maximum Punishments. To hold to the course of our prior opinions in this area ignores the substantive change made in the 1951 Manual's penal provisions, subverts the real purpose of the lesser punishment for desertion "Terminated otherwise," and accords such conclusive consideration to motive that an accused arrested by the civil authorities is rendered almost defenseless if he follows the obviously preferable course of telling the truth. It follows, therefore, that I would find the evidence in this case insufficient to establish that Private Field's desertion was terminated by apprehension and that the law officer's advice with respect to that subject was prejudicially erroneous.

As I reach these conclusions, it is unnecessary for me to express my view with reference to the further question of variance raised by the allegation of apprehension on July 28, 1961, and proof that accused was actually taken into custody by civil authorities on May 14, 1961.

I would reverse the decision of the board of review, remand the record of trial to The Judge Advocate General of the Army, and direct that the board affirm findings of guilty of desertion not terminated by apprehension and reassess the sentence.