UNITED STATES, Appellant

v.

HARVEL AYERS, Private E–2, U. S. Army, Appellee

4 USCMA 220, 15 CMR 220

No. 3765

Decided May 5, 1954

LT COL William R. Ward, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellant.

■■■■■■■■

LT COL James C. Hamilton, U. S. Army, and 1ST LT Paul Berger, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

We are presented in this case with the question of whether the date of December 23, 1950, is to be considered as falling "in time of war" for the purpose of a prosecution for an absence without leave originating within the continental limits of the United States. The accused, Ayers, was convicted, following trial by a general court-martial sitting at Fort Sheridan, Illinois, of desertion, at Fort Lewis, Washington, in violation of Article of War 58, 10 USC § 1530. He was sentenced to be confined at hard labor for one year, and to forfeit $50 of his pay per month for the same period. The convening authority approved the findings of guilty only to the extent that they included a finding that the accused had absented himself without leave for the period alleged—and accordingly he reduced the period of confinement and forfeitures. A board of review in the office of The Judge Advocate General, United States Army, held the findings and sentence, as approved, to be incorrect in law, set them aside, and directed that the charges be dismissed.

The absence specified was alleged to have begun on December 23, 1950. The sworn charges on which the accused was arraigned and tried were received by the officer exercising summary court-martial authority on March 18, 1953, The case reached us by means of the following question certified by The Judge Advocate General:

"Was the board of review legally correct in holding that the 'in time of war' provision of Article 43 (a), Uniform Code of Military Justice, is not applicable to the offense of absence without leave committed within the continental United States on 23 December 1950?"

### II

If the board of review is correct, then the Government is barred ■■■■■ ■ in this case for, in the absence of a state of war, the statute of limitations has been set at two years for the offense of absence without leave. Uniform Code of Military Justice, Article 43 (c), 50 USC § 618. However, Article 43 (a) of the same source provides that "A person charged with . . . absence without leave *in time of war* . . . may be tried and punished at any time without limitation." (Emphasis supplied.)

For compelling reasons expressed at the time, we have held in two recent cases that, for purposes of the administration of military justice, our forces in Korea were engaged in the prosecution of a war. United States v. Bancroft, 3 USCMA 3, 11 CMR 3; United States v. Gann, 3 USCMA 12, 11 CMR 12. The authorities cited and the language and reasoning used in the disposition of these cases were not sufficient, nor were they intended, to invoke the wartime provisions of the Uniform Code as to military personnel within the confines of the continental United States. Of course, this was not done for the plain reason that we were not then, as we are now, confronted by that issue. However, it was determined explicitly that the hostilities existing at that time in Korea must be equated to a state of war for purposes of military criminal law.

This conclusion was reached on the theory that—whether with or without Congressional assent—all of the practical consequences of a legally declared war were present as to United States troops in the Korean area—and that the yardstick of practicality must be used to measure the problems before us in Bancroft and in Gann. To put the matter only a little differently, we felt there that the reasons underlying certain provisions of military criminal law operative only in time of war were fully served by the Korean situation. Thus, we concluded, since the reason for the rule existed, so also did the rule. It would appear, therefore, that the two cited cases furnish us at the same time with the resolution of an analogous issue and an approach to the

**221**

one before us now—that of practicality, of broad realism, as distinguished from narrow legalism. Let us now scrutinize the problem of the cause at bar through the spectacles of the pragmatism implicit in the Bancroft and Gann cases.

## III

Recent civilian cases seem to support the applicability of such a practical approach in the present setting.[1] The Supreme Court of Texas recently passed on a claim for accidental death benefits with respect to an insured officer who was killed while travelling under military orders to Fairbanks, Alaska. There he was to perform official duties in connection with the construction of an air base. Western Reserve Life Ins. Co. v. Meadows, — Texas —, 261 SW2d 554, cert den 347 US 928, 98 L ed —, 74 S Ct 531. The insurance policy in suit provided that the obligation to pay benefits would be void if the insured "shall be in military, naval or allied service in time of war at the date of the accident." The Texas court indicated that, within the framework of the insurance contract, the term "war" might be given its "plain, ordinary and generally accepted meaning" of "war in fact"; or, on the other hand, might be accorded a more limited construction—that is one signifying "technical war," or "legal war," which is to say a war declared by Congress. The opinion suggested that, although the latter alternative be accepted, and if there be required legislative recognition of the existence of "war," this has been supplied in ample measure by numerous Congressional enactments. The court emphasized that (at page 556):

"... Congressional support of the action in Korea, which we know was in fact war on a large scale, was necessary, and was freely and generously given in many Acts of Congress by which provision was made for support of the armed forces employed, for increased military man power and equipment, and for economic stabilization. Many of those Acts of Congress, including vast appropriations for the support of the armed forces in Korea, are referred to in the dissenting opinion of Chief Justice Vinson in the steel mill seizure case, Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 72 S. Ct. 863, 96 L. Ed. 1153, 1215, 1216–1218, 26 A. L. R. 2d 1378. Reference is there made to the one hundred thirty billion dollars appropriated by Congress for our armed defense and for military assistance to our Allies since the June, 1950, attack in Korea, to the Mutual Security Act of 1951, 22 U. S. C. A. § 1651 et seq., to the grant by Congress of authority to draft men into the armed forces, to the increase in appropriations to the Department of Defense, which had averaged less than thirteen billion dollars per year for the three years before the attack in Korea, to forty-eight billion dollars for the year 1951. There were other Acts of Congress recognizing the existence of war in Korea and enabling the government to prosecute it with vigor and efficiency, such as the Servicemen's Indemnity Act, 38 U. S. C. A. § 851 et seq., a new GI Bill of Rights, 38 U. S. C. A. § 694 et seq., the 1950 Amendment to the Revenue Act, 26 U. S. C. A. and again more appropriations. Those Acts were in acknowledgment of the fact of war in which the Nation was engaged. And to use the language of Justice Grier in his opinion in the Prize cases above quoted, if it is necessary to the technical existence of war that it have legislative sanction, the Acts of Congress above referred to gave sanction."

---

[1] No reference has been made in the body of the opinion to United States v. Smith, 342 US 225, 96 L ed 252, 72 S Ct 260, and related inferior court cases, dealing with Federal legislation suspending the running of the statute of limitations in fraud cases "when the United States is at war." This omission was advised—for the plain reason that the bearing of the Korean conflict on the problem there was in no slightest degree relied on by counsel or considered by the Court. Under no accepted theory of case interpretation of which the majority is aware may it be said that these decisions can help us here.

The court went on to express its conclusion that the parties to the insurance contract had not intended to refer therein to a "technical war," but instead had meant to adopt a realistic interpretation of the word "war." In this connection the court said:

"We are unwilling in deciding this case to shut our eyes to what everyone knows, that there has been and was when the insured was killed, actually and in reality a war in Korea in which the United States has been seriously engaged."

A Federal District Court, in Weissman v. Metropolitan Life Ins. Co. 112 F Supp 420 (SD Cal), took a similar position in construing an insurance contract proviso and denying double indemnity because this country was "at war." There the following language was used:

"In the case at bar (without admitting it was necessary under the circumstances for Congress to baptize the Korean conflict by giving it the name of 'war') it is plain there certainly has been legislative sanction thereof. Because Congress has seen fit to provide money necessary to carry on the conflict, furnish arms, munitions, ships and troops and to proceed in the same manner as if there had been a formal declaration of war, under the authority of the Prize Cases, supra, this court certainly is justified in finding that if such a declaration were necessary, nonetheless, the conflict has received the sanction of Congress."

The Iowa Supreme Court also recently ruled that the Korean hostilities constituted "war" within the meaning of an insurance policy. See Langlas v. Iowa Life Ins. Co., — Iowa —, — NW 2d — (April 7, 1954). The court remarked:

"The unreality of adopting an interpretation which would hold the Korean struggle not to be a war within any reasonable meaning is pointed up by the fact that as of March 28, 1952 (three days after the insured met his death in the fighting), total United States casualties were 106,956, with 16,739 killed and 77,651 wounded and 9,916 missing in action. Of all wars in which this country has been engaged, only the two World Wars and the Civil War exceeded the Korean struggle in cost, in casualties, and money.

". . . Many conflicts have been referred to as 'wars' when there was no formal declaration. Thus, in the Iowa Code of 1950, Section 427.3, paragraph 2, are references to the 'war of rebellion' and 'Indian wars.' The Philippine Insurrection has been held to be a war within the meaning of an exclusionary clause in an insurance contract. LaRue v. Kansas Mutual Life Insurance Company, 68 Kan. 539, 75 P. 494. Likewise the Civil War, in the Prize Cases (The Army Warwick) 2 Black 635, 17 L. Ed. 459; and the Boxer Uprising in China, Hamilton v. McClaughry, 136 Fed. 445. The Maine Supreme Court has put it in this pertinent language: 'But every forcible contest between two nations, de facto, or de jure, is war. War is an existing fact, and not a legislative decree. Congress alone may have power to "declare" it beforehand, and thus cause or commence it. But it may be initiated by other nations, or by traitors, and it then exists, whether there is any "declaration" of it or not. It may be prosecuted without any declaration; or Congress may, as in the Mexican War, declare its previous existence.' Dale v. Merchants Mutual Marine Insurance Company, 51 Me. 465, 470. In Stankus v. New York Life Insurance Company, supra, page 689 of 44 N. E. 2d, the Massachusetts Supreme Court said: 'A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war.' On page 688 from the same citation is this statement: 'But the existence of a war is not dependent upon a formal declaration of war.' Hostilities on the high seas between naval forces of France and the United States were held to be a 'war' although there was no declaration. Bas v. Tingy, 4 Dall. 37, 1 L. Ed. 731. Webster's definition is: 'The state or fact of exerting

violence or force against another, 'now only against a state or other politically organized body.' "

A New Jersey court was faced with an identical problem. Pointing out that the word "war" must be given a "realistic interpretation" when used in private contracts, the court reached the conclusion that the hostilities in Korea constituted war within the meaning of the insurance policy's terms.[2] Various enactments were adverted to in support of the court's statement that "Congress (as well as every person in the civilized world) knows that the United States is at war in Korea."[3] Stanbery v. Aetna Life Ins. Co. 26 NJ Super 498, 98 A2d 134. It was precisely for the reasons set out in the preceding cases that we reached the conclusion expressed in the Bancroft and the Gann cases, supra.

These civilian cases present instances in which, despite the familiar judicial tendency to construe insurance policies in favor of an insured person, recovery was denied because (1) "war" was intended by both insurer and insured to receive a realistic interpretation, and (2) because—conceding arguendo that legislative sanction for war is required—numerous statutes attest that this understructure was amply supplied in the instance of the Korean imbroglio. Is this Court to assume that Congress charged its members to be less realistic in construing Article 43(a)? Thus, although hostilities in Korea were being conducted under the banner of the United Nations, the significant feature to our notion is that American personnel and materiel in tremendous quantities were being shipped to the front. Certainly, seen from state-side, most of the attributes of a declared war were undeniably present. Apart from the enormous size of the earlier operation, we can, in fact, discern no significant difference between the Korean phenom-

---

[2] The realism of the New Jersey court is in line with that expressed in New York Life Ins. Co. v. Bennion, 158 F2d 260 (CA 10th Cir) cert den 331 US 811, 91 L ed 1831, 67 S Ct 1202. There the court concluded that a death occurring on December 7, 1941, took place while the United States was "at war"—with the result that the insured's beneficiaries were precluded by the policy from recovering double indemnity for an accidental death. The court states: "When one sovereign attacks another with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, we have war in the grim sense of reality. It is war in the only sense that men know and understand it. Mankind goes no further in his definitive search—he does not stand on ceremony or wait for technical niceties. To say that courts must shut their eyes to realities and wait for formalities, is to cut off the power to reason with concrete facts. We cannot believe that the courts are deprived of the power to deal with this vital question in a practical and realistic sense." The Massachusetts Supreme Court considered a similar problem resulting from the death of a sailor on the U.S.S. Reuben James in October 1941. The court posed the possibility that even at that time the United States was engaged in a "war." Stankus v. New York Life Ins. Co. 312 Mass 366, 44 NE2d 687.

[3] North Dakota statutes enacted during World War II authorized loans to persons who had been members of the armed forces of the United States while the United States was at war. In December 1951 the Attorney General of North Dakota ruled that veterans of more than thirty days' service during the Korean hostilities were eligible for such loans. It was stated: "We are informed by the newspapers and radio that there are many thousands of American soldiers, sailors, Marines and airmen now engaged with soldiers of North Korea and China in open warfare. Can there be any doubt that the United States is now at war in Korea? We think not." See New York Times for December 28, 1951, page 2, column 4.

The New York Times of March 20, 1953, page 1, column 1, reports an expression of opinion by President Eisenhower with respect to the nature of the Korean fighting. The President "agreed with Clausewitz, the German warrior-philosopher, that there were all kinds of different wars, but he did not agree with President Truman that what was going on in Korea was a 'police action.' It would be his upbringing, he remarked, but he was inclined to think that Korea was a 'war.' "

224

enon and that found during the struggle described as World War II.

## IV

In connection with the civilian cases mentioned earlier, we must emphasize that in Western Reserve Life Ins. Co. v. Meadows, supra, no death or specific incident in Korea was before the court for consideration. The remaining authorities cited do not indicate—or even suggest—that a different result would have been forthcoming had the insured been killed at a place other than in Korea. Yet it is insisted that we must restrict the ambit of Article 43(a) to absences and desertions having their origin in the Korean zone of operations.

An attempt to bolster this contention is made through the assertion that an anomaly would exist if we were to hold that absences originating within the United States are not subject to the statute of limitations at a time when they *are* subject to the limitations of the Table of Maximum Punishments. The premise seems to be that, since the President did not see fit to suspend the Table of Maximum Punishments as to desertions occurring within the continental limits of the United States, such desertions may not properly be regarded as having transpired in time of war.

The unsoundness of this premise may be demonstrated by reference to events following World War II. De facto peace —that is, an end to the "shooting war" —arrived during the fall of 1945. A cessation of hostilities was proclaimed on December 31, 1946. Pres Procl 2714. On January 19, 1946, the President terminated the suspension of certain portions of the Table of Maximum Punishments, save as to occupied territories. Executive Order 9683. On August 24, 1946, he terminated all remaining suspensions on maximum punishments. Executive Order 9772. Yet, so far as Congress was concerned, World War II for many purposes continued. Not until July 25, 1947, in fact, did Congress by Joint Resolution proclaim that World War II had come to an end insofar as the prosecution of wartime desertion was concerned. 61

Stat 449. For certain other purposes World War II continued until 1951. State v. Gibson, 258 Ala 512, 64 So2d 75; Miley v. Lovett, 193 F2d 712 (CA 4th Cir), cert den 342 US 919, 96 L ed 687, 72 S Ct 366. Accordingly, any desertion occurring prior to July 25, 1947, is safely beyond the operation of the statute of limitations—and, indeed may be prosecuted to this very day. It is to be noted that this result obtains as to absences or desertions which began even subsequent to the time at which the President reimposed limitations on the punishment for such offenses. And the fact that the absence originated at a place far removed from conflict—or, indeed, at a time when all hostilities had ceased both in Europe and Asia—is wholly without significance.

Congress simply intended that any unauthorized absence or desertion which occurred prior to the Joint Resolution of July 1947 should be subject to prosecution despite the passage of years. In determining what absences during the course of the Korean hostilities were meant by Congress to fall within the ambit of Article 43(a), recourse may be had to a more specific applicability-index. In accordance with the pragmatic approach delineated earlier in this opinion, we can discern no difference in seriousness between a desertion from a main line of resistance in the Korean area and one from front line combat in the course of a fully declared war. Therefore we would be required to regard desertion from hostilities in Korea as falling within the purview of Article 43(a). Cf. United States v. Bancroft, supra; United States v. Gann, supra. When asked— as now—to differentiate in result between an unauthorized absence occurring within the continental United States and one arising in Korea, we recognize immediately that, whether the defection occurs at a port of embarkation on the eve of a shipment of personnel, or following a unit's arrival in Korea, we are faced with essentially the same problem. In either instance the Armed Forces are deprived of a necessary—perhaps vitally necessary— combat replacement. In both instances

the military is faced with a dilemma. Either its authorities must organize a costly search for the absentee, or the Armed Force concerned is required to risk the loss of his services permanently. Clearly, too, the deleterious effect on morale of unauthorized absence is more substantial when the absentee may be escaping the hazards and risks of transfer to the Korean conflict than when—as in "peacetime"—he can evade no more than the comparatively minor inconveniences of service life.

In peacetime, too, unauthorized absentees are ordinarily apprehended without difficulty, and no undue burden is placed on the Armed Forces by a rule requiring dispatch in the prosecution of offenders. However, under the disorganization and distractions of war, serious obstacles are apt to be encountered—both at home and abroad—in the apprehension of such culprits by persons and agencies concerned primarily with emergency functions of gravest importance to the national welfare. Admittedly there will be instances when, even during wartime, an absentee may be apprehended readily. Nevertheless, it is undeniable that the existence of hostilities increases not only the incentive for unauthorized absence, but also the ability to escape apprehension. It was largely for this reason, no doubt, that the pressures inherent in the statute of limitations were removed from the services during such a period. Although phrased somewhat differently, is it not as arguable in the case at bar—as it was in Bancroft—that where the reason for the rule of limitation fails, then the rule fails with it? And has not the reason failed here as completely as it would have done in the case of an international conflict declared in due and ancient form? We are sure that it has.

The difficulty of apprehending and punishing unauthorized absentees in wartime was thoughtfully considered during the deliberations leading to the adoption of the Uniform Code. Hearings before House Armed Services Committee, 81st Congress, 1st Session, on HR 2498, page 1039. There Robert W. Smart, Esquire, professional staff member of the House subcommittee,

said in speaking of a closely related matter: "In peacetime, I do not think you are going to have so much difficulty in apprehending these people within the statutory period of limitations." Again, in discussing the unauthorized absentee, he stated: "In peacetime I still say that they will apprehend him in 9 cases out of 10, because of your regular troop activity, and the greater control over them. That is contrasted to wartime situations where you have great fluidity and movement of people all over the country and in all foreign countries." House Hearings, supra, page 1041. Mr. Smart might well have added as an additional aggravating factor the high ratio during a "war situation" of untrained clerical, supervisory, and other personnel—with resultant inaccuracies in the maintenance of personnel accounting paper work and related activities.

We believe it reasonable to assume from the foregoing that the removal of the statute "in time of war" was realistically conditioned by Congress on the existence of a state of affairs under which persons absent without proper authority might evade punishment through the running of the peacetime limitations rule. The risk of this latter was distinctly present after June 1950 for the reason that the stresses of war—de jure or de facto—may have been expected to preclude the maintenance of an adequate police force, and because inexperienced and overworked record custodians might understandably fail to note and to act properly with respect to an absence. The possibility that such offenders should go unpunished, while their fellows in Korea—who did not run away quite so precipitately—would stand amenable to prosecution, despite the lapse of the peacetime statutory period, might easily disturb the most placid student of the problem, and appears to have disturbed the Congress as well.

Furthermore, it is obvious that modern integrated war operates to subject troops to the possibility of rapid transfer—often by air—to any point on the world's surface at which hostilities are blazing. Units within the zone of the interior are, and must necessarily be,

subject to distinctly higher requirements of combat readiness than during a previous period when a combat zone was more isolated. We entertain no doubt that the realities of atomic-age warfare were thought by the Congress to require measures which would insure combat readiness even of units located within the United States.

Admittedly the statute of limitations applicable to a particular offense is not to be regarded as a part of the punishment for that offense. For this reason a period of limitation may be extended subsequent to the commission of a crime without violating proscriptions against ex post facto legislation. See, e.g., United States v. Schauf, 2 CMR (AF) 325; 15 Am Jur, Criminal Law § 342; 22 CJS, Criminal Law § 224. But, although no part of the punishment, it is undeniable that a "long" statute serves as an added deterrent to the commission of crime—since it decreases the possibility of escaping successful prosecution for a contemplated offense, and thus enhances the risk associated with that offense.

The gravity of wartime desertion and absence without leave—a gravity which under modern conditions of mobile warfare is largely independent of where the crimes occur—together with the probability that, if a short period of limitations were applicable, these offenses would carry their own immunity, convinces us that Congress intended Article 43(a) to apply during the hostilities in Korea even to unauthorized absences originating within the United States. Certainly the reasons for authorizing unlimited prosecution for state-side desertions during the time of the Korean fighting seem as understandable as those which underlay Congress' decision to exclude from the statute of limitations desertions which followed the termination of hostilities in World War II, but preceded the Joint Resolution of July 25, 1947. Moved by what we conceive to be the clear policy underlying Article 43(a), we must hold that no limitation applies to unauthorized absences, whether from a unit located in Korea or within the continental limits of the United States.

V

Certain concluding observations seem fitting. First, we must emphasize that the absence with which we are presently concerned began at a time when large-scale hostilities were in progress in Korea, and not merely during a period of what has been characterized as "cold war." Secondly, there is involved here no question of purloining from Congress the power to declare war, or not to declare it. The Articles of War and the Uniform Code—on both of which the instant prosecution may be said to be premised—derive from Congress alone, and not from any other branch of the Government. It seems to us, therefore, that there is no need to consider the constitutional division of powers between the executive and legislative branches of the Government. Instead we are concerned only with the intent and purpose of the latter arm in the exercise of its power. Finally, in view of the fact that the phrase "time of war" appears in several distinct Articles in the Uniform Code, supra—e. g., Articles 43, 90 and 106—we are constrained to point out that its meaning, as it may be used in any particular Article, must be determined with an eye to the goal toward which that Article appears to have been directed.[4] This cautious and individualized approach toward Articles of the Code—far from being incongruous—seems dictated by the precedent of Congressional intent in dealing with the problems of World War II. Upon the termination of actual hostilities in World War II, Congress indicated unmistakably that it wished the War to terminate for certain purposes, but allowed it to remain

---

[4] The cases construing "war" within the meaning of insurance policies form a close parallel to our present problem. There the courts are inquiring into the basic purpose of the insurer and insured in excluding the payment of double indemnity benefits for death arising from military service in time of "war." See Langlas v. Iowa Life Ins. Co. supra. We are concerned with the purpose of Congress in conditioning various legal consequences on a state of "war."

in effect for others. Our concern in coping with this and other legal problems arising out of the Korean situation must be with determining as a matter of interpretation whether, within the framework of Congressional intent, war existed for the purposes of the specific provision under consideration.

## VI

Accordingly, the decision of the board of review is reversed, and the case is remanded for further proceedings not inconsistent with the views expressed in this opinion.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

I dissent.

On June 25, 1950, Communist aggressors began the hostilities in Korea. The United States became engaged in resisting aggression in response to the call of the United Nations Security Council. 96 Cong Record 9228; Department of State Publication No. 4287, "The United Nations and Collective Action Against Aggression." So generous and extensive was our response that we were soon providing the major part of the military and economic support to the Republic of Korea. However, the Korean hostilities did not precipitate the United States into a full-scale state of war. On June 30, 1950, on the floor of the United States Senate, Mississippi Senator Stennis declared that this joinder of United Nation forces provided "a new method of meeting world emergencies and a new method of preventing war." 96 Cong Record 9540. See also: Collier's Yearbook, 1951, page 674.

Unquestionably hostilities in Korea produced the consequences of war in that area. That situation was expressly recognized by this Court in United States v. Bancroft, 3 USCMA 3, 11 CMR 3. But, the entire genius of our Government's policy in the Korean crisis was to confine the hostilities and its consequences to the combat zone. This was made clear by Congressional and Presidential action, following the engagement of American forces as part of the United Nations command.

**228**

On June 28, 1950, one day after President Truman ordered military support for South Korea, as well as the acceleration of the program of military assistance for the support of Indo-China and the Philippines, the late Senator Taft declared in the Senate that this commitment meant *de facto* war, but he made it clear that he did not regard the war as extending to the continental United States. He considered the President's action as only a new executive development of the foreign policy of the United States which brought danger of war, but not war itself. 96 Cong Record 9322. Six months later, Senator Taft emphasized his understanding that, in spite of the Korean conflict, the continental United States was not in a state of war. In a speech on foreign policy in the Senate on January 5, 1951, he said (97 Cong Record 56):

> "Since there is a greater possibility, however, of a destructive war against our liberty than we have ever faced in the past, at least since the Revolutionary War, there is no doubt that we should go just as far toward preparing for war as we can go in time of peace without weakening ourselves in the long run and destroying forever the very liberty which war is designed to protect."

In a later discussion of the use of ground troops in Europe, he said (Ibid, page 148):

> "However, in the case at hand, it seems to me that we have a question of foreign policy rather than of arms. We have a question of whether or not we are going to commit the United States. Certainly there is a tremendous difference between sending an army of 30 divisions to Europe and occupying Germany with two divisions as a force of occupation. Those are basic questions, which it seems to me are well within the authority of Congress to determine in time of peace.
>
> "Is it not true also that for many years the law provided that the President could send no troops outside of continental United States in time of peace?"

On January 15, 1951, Senator Douglas of Illinois, referring to the history of Communist threats to world peace, made it evident that he did not regard Korea as indicating a state of war in the continental United States. Thus, he said (Ibid, page 242):

"We Have Every Reason To Fear Russian Aggression.

"But we are now in January 1951. A totalitarian power which most of us have long believed was committed by its very nature to a garrison state threatening expansion, has now committed its largest satellite, China, to the risk of a general war. Acting through the United Nations we prevented Russian aggression in Iran, in the Dardanelles and in Greece. Acting with our British and French allies, we prevented the Russian seizure of Berlin.

"Wherever we showed strength to resist Communist aggression the Russians backed down.

"Last June 24, however, the forces of world communism, solidly backed by Russia, committed armed military aggression across the whole of a national frontier. Korea, Mr. President, is all too grim and bloody a fact, as is known to many American families. *If war comes*, it will have been instigated by Russia, not by us. And we should not by an injudicious use of words, such as the Senator from Ohio's [Mr. Taft's] statement implying that we would be the main instigators of a war if we sent additional troops to Western Europe, give the Russians a propaganda weapon, which, though untrue, can be and is being used against us."

Similar expressions of Congressional opinion appear in other discussions on the floor of both houses of Congress. See 97 Cong Record 163, 188–189. See also Congressional Committee Reports on Universal Military Training and Service Act—Senate Report No. 117 on S 1, House Report No. 271 on S 1, and Conference Report No. 535 on S1, 82d Congress, 1st Session.

Congressional understanding of the delimited nature of the hostilities also appears in its action on specific legislation. Congress was considering an extension of the Selective Service Act of 1948, when the Communist aggression began in Korea. It is significant that the bill was extended for only one year. 64 Stat 318. Equally significant is the limitation written into the Universal Military Training and Service Act on June 19, 1951, which expressly prohibits extension of certain enlistments without consent, in the absence of a war or national emergency declared by Congress. 65 Stat 75, 88. Similar in nature to these actions is the grant of the free mail privilege. During general wartime conditions, the privilege was extended to military personnel within, as well as without, the continental limits of the United States, 56 Stat 176, 181, 59 Stat 538, 542. However, when Congress reinstated the privilege on July 12, 1950, it was expressly limited to the forces in Korea and such areas as may be designated by the President as combat zones. 64 Stat 336, 65 Stat 90; 50 USC App § 892. Also in the same category is the grant, in September 1950, of certain income tax advantages in the form of exclusions of pay from gross income. In time of general conflict this exclusion was authorized for all personnel on active duty, wherever the place of their service. 61 Stat 917, 918. In the present situation the grant is only to those serving in a combat zone, as designated by the President. 65 Stat 920, 26 USC § 22b (13).

Other contemporaneous acts of Congress indicate that it did not consider the hostilities in Korea as a state of war in the United States itself. Only one more act of particular significance needs mention, and that is the Defense Production Act (Public Law 774, 81st Congress, 2d Session). The policy statement of the Act, reads as follows:

"Declaration of Policy. Sec. 2. It is the policy of the United States to oppose acts of aggression and to promote peace by insuring respect for world law and the peaceful settlement of differences among nations. To that end this Government is pledged to support collective action through the United Nations and

through regional arrangements for mutual defense in conformity with the Charter of the United Nations. The United States is determined to develop and maintain whatever military and economic strength is found to be necessary to carry out this purpose. Under present circumstances, this task requires diversion of certain materials and facilities from civilian use to military and related purposes. It requires expansion of productive facilities beyond the levels needed to meet the civilian demand. In order that this diversion and expansion may proceed at once, and that the national economy may be maintained with the maximum effectiveness and the least hardship, normal civilian production and purchases must be curtailed and redirected.

"It is the objective of this Act to provide the President with authority to accomplish these adjustments in the operation of the economy. It is the intention of the Congress that the President shall use the powers conferred by this Act to promote the national defense, by meeting, promptly and effectively, the requirements of military programs in support of our national security and foreign policy objectives, and by preventing undue strains and dislocations upon wages, prices, and production or distribution of materials for civilian use, within the framework, as far as practicable, of the American system of competitive enterprise."

This policy statement makes it clear that Congress regarded the Korean conflict as emphasizing the importance of military and economic preparedness, but there is in it not the slightest intimation of a state of war within the territorial limits of this country.

The executive branch of the Government has taken a similar view of hostilities in Korea. In his Proclamation of a National Emergency on December 19, 1950, President Truman referred to the events in Korea and elsewhere as constituting "a grave threat to the peace of the world and imperil[ing] the efforts of this country and those of the United Nations to prevent aggres-

sion and armed conflict." He did not proclaim that the continental United States was in a state of war; rather he declared that "the increasing menace of the forces of communist aggression requires that the national defense of the United States be strengthened as speedily as possible." Procl No. 2914, 15 Fed Reg 9029. Other proclamations express a like understanding of the limited scope of the war in Korea. See Procl No. 2918, 16 Fed Reg 2383; Procl No. 2927, 16 Fed Reg 4367; Procl No. 2928, 16 Fed Reg 4607.

Of special significance in the solution of the problem in this case is the President's suspension of the Table of Maximum Punishments. When our country was at war, the Table was suspended for every part of the world in which American forces were located. Executive Order 9048, February 3, 1942; Executive Order 9267, November 9, 1942. To meet the purposes of American participation in the United Nations resistance of aggression in Korea, it was suspended only in the Far East command. Executive Order No. 10149, August 8, 1950, 15 Fed Reg 5149.

The majority would extend the Korean conflict to the continental United States because "most of the attributes of a declared war" are present. Most, if not all, of these attributes, including Selective Service and the movement of men to the Far East, were in existence before the communist aggression. They constituted an integral part of the American program for national defense and the preservation of world peace. After the aggression in Korea, it was evident that the degree of preparedness was insufficient. Much more was required. Suitable measures were taken, not because of the hostilities in Korea as such, but because those hostilities highlighted the danger of communist aggression against our homeland. Even in the area of civilian defense there was no indication that the Korean hostilities had created a state of war in the United States. On December 20, 1950, Representative Durham of North Carolina initiated the discussion in the House of Representatives on the Federal civilian defense program. He made it clear that civilian defense was part

of the long-range defense effort, and was not prompted by the hostilities in Korea. 96 Cong Record 16826–28. As a matter of fact, Representative Javits of New York insisted that the record show emphatically that the civilian defense emergency which could be declared by the President under the Act was not the same as the national emergency that the President had declared the previous day under the Defense Production Act. Ibid, page 16831.

The majority rely upon the holdings of some courts, that the provisions of an insurance policy excluding certain death benefits in the event that the insured dies in the military service "in time of war," applies to a situation such as that resulting from the hostilities in Korea. Other courts have, with equal vigor, construed the same provisions as applying only to a war officially declared by Congress. Harding v. Pennsylvania Mut. Life Ins. Co. 373 Pa 270, 95 A2d 221, cert den 346 US 812, 98 L ed —, 74 S Ct 21, and Beley v. Pennsylvania Mut. Life Ins. Co. 373 Pa 231, 95 A2d 202, cert den 346 US 820, 98 L ed —, 74 S Ct 34; McClintic v. Metropolitan Life Ins. Co. 68 Am Life Convention Legal Bull 72 (Sup Ct, Marion Co, Ind); Dean v. Atlantic Life Ins. Co. Ibid 61 (Cir Ct, Wise Co, Va); Hawkins v. Metropolitan Mutual Assur. Co. 69 Am Life Convention Legal Bull 52 (Cir Ct, Cook Co, Ill). Moreover, with but one exception, the cases cited by the majority were concerned with an insured who died in Korea. To that extent they are not inconsistent with the well-settled principle that the consequences of war may be present in an area of actual hostilities. Bas v. Tingy, 4 US 37, 1 L ed 731. United States v. Bancroft, supra; Hamilton v. McClaughry, 136 Fed 445 (CC Kan). In any event, these insurance clause cases are not germane to the problem here. The meaning of a public law is to be found in what Congress itself has done and said. From my review of Congressional action, I am convinced that Congress did not conclude that Korea plunged the entire country into a state of war. No doubt, "the conflict . . . received the sanction of Congress" but every action on its part indicates that Congress regarded Korea as limited in place, in purpose, and in its consequences.

Much more applicable to our problem than the insurance cases are the Federal court decisions construing 18 USC § 3287, which provides that the running of the statute of limitations on fraud offenses shall be suspended "when the United States is at war." In United States v. Taylor, 4 USCMA 232, 15 CMR 232, this Court noted that section 3287 was the model for subdivision (f) of Article 43. The language of subdivision (f) is almost the same as that in subdivision (a), the particular section of Article 43 under consideration in this case.

In United States v. Smith, 342 US 225, one of the offenses was committed before hostilities in Korea. However, the statute of limitations against the offense had not yet run when the communist aggression took place in that country. Notwithstanding the Korean situation, the United States Supreme Court held that section 3287 did not apply, and that the regular statute of limitations was controlling. Although the effect of Korea was apparently not relied upon by counsel, it is significant that the case was argued before the Supreme Court in December 1951, almost a year and a half after the aggression in Korea. Certainly, if the Supreme Court considered the Korean situation as tantamount to a state of war in the United States, it could have taken judicial notice of the hostilities and held that the United States was at war. But, it did not do so. Since the decision in the Smith case, United States district courts have repeatedly dismissed indictments filed after the normal periods of limitations, in spite of the fact that the regular periods had not expired at the time the United States sent its forces into Korea. United States v. Witherspoon, 110 F Supp 364 (DC Tenn); United States v. Minkow, 108 F Supp 509 (DC Ill); United States v. Peoples Savings Bank in Providence, 102 F Supp 439 (DC RI).

In part, at least, the majority bases its argument upon the difficulty of apprehension of deserters in a period of

war. As I understand this argument it actually gives support to the reasonableness of extending the statute of limitations in time of war; it does not supply any basis for the conclusion that the present emergency is really a state of war. As far back as April 1952, this Court in United States v. Ferretti, 1 USCMA 323, 3 CMR 57, did not regard the situation in the United States as so disorganized and distracted as it is now made out to be. Speaking on the subject of an apprehension, made at a time shortly after the offense in this case was committed, we said:

". . . Peterson remained at his home of record during the entire period of the offense, and thus could have been apprehended with ease and returned to military control."

No doubt, if the accused conceals himself, or remains away from his home of record, he may never be apprehended. However, that does not mean that such concealment can successfully bar prosecution because of the running of the statute of limitations. Under the Code, the period of limitation ends when sworn charges are received by an officer exercising summary court-martial jurisdiction over an accused. Article 43, Uniform Code of Military Justice, 50 USC § 618; Manual for Courts-Martial, United States, 1951, paragraph 68c, page 100; United States v. Nichols, 2 USCMA 27, 6 CMR 27. Knowledge of the specific whereabouts of the accused is unimportant. It is only necessary to know that he is absent without authority. Determination of that status may sometimes be delayed in places where changes of personnel are frequent, but reason indicates that, under present conditions, it should not take three years to discover an absence.

Fear has been expressed that an unconscionable few, who, by desertion or unauthorized absence, have avoided the hardships of service in time of emergency, may escape punishment for their offense. There may be some cause for such fear, but we cannot overcome it by judicial legislation. Congress and the President have unmistakenly indicated that the war in Korea did not create a "state of war" in the continental limits of the United States. This Court cannot go beyond the limits delineated by Congress and the President. If the danger is great, Congress can correct the situation by providing for an extension of the statute of limitations during the present period of national emergency. Falter v. United States, 23 F2d 420 (CA2d Cir 1928), cert den 277 US 590, 72 L ed 1003, 48 S Ct 528.

I would affirm the decision of the board of review and dismiss the charges.