UNITED STATES, Appellee

v.

FRANK TAYLOR, Jr., Private E–1, U. S. Army, Appellant

4 USCMA 232, 15 CMR 232

233

No. 3812

Decided May 5, 1954

LT COL Herman P. Goebel, Jr., U. S. Army, and 1ST LT David J. Conroy, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

Opinion of the Court

PAUL W. BROSMAN, Judge:

Following trial by a general court-martial convened in Japan, the accused was found guilty under a specification alleging that, on February 20, 1951, he had fraudulently enlisted in the United States Army. Charges on which the trial was predicated were not preferred until March 1953. The convening authority approved and a board of review has affirmed the findings and the sentence rendered thereon. This Court granted the accused's petition for review for the purpose of determining whether prosecution was barred by the statute of limitations, and, if so, whether that bar had been waived—as well as to pass on the admissibility of certain Government exhibits.

II

The offense was alleged as a violation of the Uniform Code of Military Justice, Article 83, 50 USC § 677, although in fact it occurred at a time when the Articles of War were effective. This circumstance is of no import, however, since Article of War 54, 10 USC § 1526, defines fraudulent enlistment

234

in terms substantially identical with those of the Code. Moreover, it is the period of limitation provided in the Uniform Code which must determine the disposition of this case. See United States v. Schauf [ACM 1659], 2 CMR (AF) 325.

Under the Code, prosecution is barred in most instances if more than two years have elapsed between the commission of the offense and the "receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command." Uniform Code of Military Justice, Article 43(c), 50 USC § 618. Clearly this requirement was not met in the case at bar. However, in Article 43(f) Congress has provided that the running of the statute of limitations will be suspended "when the United States is at war"—as to any offense under the Code "involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not." Comparison reveals that the wording of Article 43(f) is identical in every significant respect with that of 18 USC § 3287, which—under certain circumstances—operates to suspend the running of the statute of limitations with respect to prosecutions in civilian courts. The legislative history of the Code demonstrates that this resemblance is not accidental, and that Article 43(f) was taken directly from 18 USC § 3287, for the purpose of escaping the possibility that the latter suspension of limitations might be deemed inapplicable to trials by court-martial. House Report No. 491, page 22 and Senate Report No. 486 on H.R. 4080 and Hearings before House Armed Services Committee, page 1044, on H.R. 2498, 81st Congress, 1st Session.

Under these circumstances we feel impelled to follow the construction which the Supreme Court has recently placed on the last-mentioned section of the United States Code. By way of background, it should be pointed out that the reference in Article 43(f) of the Uniform Code to "fraud" is other than lucid. The origins of 18 USC § 3287—on which 43(f) is modelled— might well lead to the conclusion that the only "fraud" within its ambit is that closely connected with wartime conditions and especially related to contracts for the procurement of materiel, or for the disposition of war surplus. On the other hand, it has been established that, in certain legislative contexts, the term "fraud" includes any conduct "calculated to obstruct or impair its efficiency [that of the United States] and destroy the value of its operations and reports as fair, impartial, and reasonably accurate." Haas v. Henkel, 216 US 462, 54 L ed 569, 30 S Ct 249. Under such a view the suspension of limitations during wartime would apply although the offense alleged produced no pecuniary loss to the United States. United States v. Gottfried, 165 F2d 360 (CA2d Cir).

In interpreting 18 USC § 3287, the Supreme Court took the ideologically intermediate position that the suspension of limitations applied only to crimes "where the fraud is of a pecuniary nature or at least of a nature concerning property." Bridges v. United States, 346 US 209, 97 L ed 1557, 73 S Ct 1055. Thus, certain alleged false oaths by the labor leader, Harry Bridges, in connection with naturalization proceedings were held not to constitute "frauds." Ibid. On the other hand, the presentation to the Commodity Credit Corporation of false certificates concerning the purchase of wool, in an attempt to obtain payment from the Corporation, was considered by the Supreme Court to be a "fraud" within the purview of the suspension of limitations. United States v. Grainger, 346 US 235, 97 L ed 1575, 73 S Ct 1069.

We observe that the offense of fraudulent enlistment is not one in any way peculiar to wartime, and does not grow out of wartime contracts. Cf. Bridges v. United States, supra. However, it is in no sense revealed clearly in the Grainger opinion that the dealing between the defendant there and the Commodity Credit Corporation bore any sort of relation to the war effort. Fraudulent enlistment is in any event an offense requiring as a necessary element the receipt of pay and allowances by

the enlisted person. United States v. Luce [ACM 4191], 2 CMR 734; United States v. Revels [ACM 2229], 2 CMR (AF) 500. Indeed, Colonel Winthrop doubted that courts-martial might lawfully punish misrepresentations which led to an enlistment—for those misrepresentations preceded the time when military jurisdiction attached to the enlistee. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 733. Since the offense of fraudulent enlistment requires as an element of proof the establishment of pecuniary loss to the United States in the form of pay and allowances furnished to the enlistee—and furnished by reason of his misrepresentations—we are sure that the offense falls within the content of meaning attaching to the term, "fraud," as used in Article 43(f).

Unfortunately we have found no cases interpreting the phrase "at war" for the purposes contemplated by 18 USC § 3287—nor have any been called to our attention.[1] Defense counsel have placed stress on the reference therein—as well as in Article 43(f)—to a "termination of hostilities as proclaimed by the President or by a joint resolution of Congress." In their view, the use of a formal proclamation, or resolution, to signify the end of the war status signifies an intent to require a formal declaration of the inception of the same status. Seldom, if ever—the argument continues—will there be a formal proclamation of the termination of hostilities unless there had also been a formal declaration of war. Accordingly—since the Korean struggle was denominated a "police action," and was never a declared war—Article 43(f) did not take effect during the conflict there.

Contrariwise, to our minds, the reference to a proclamation of termination of hostilities was not designed to exclude the suspension of limitations on "fraud" in instances where the United States had engaged in large-scale conflict—although without the benefit of a formal declaration of war. The legislative hearings reveal clearly that the Congress was deeply concerned over the possibility that wartime frauds might not quickly be discovered, and distinctly desired an extensive term of amenability to prosecution therefor. Moreover, it was pointed out to Congress "that the official termination of the war is usually not declared until a considerable period after the cessation of actual hostilities." We are sure, therefore, that the reference in Article 43(f) to a proclamation of termination of hostilities was made for the purpose of affording the Government an additional period within which to discover and prosecute "frauds" by means of deferring the running of the statute for three years following a formal proclamation of termination of hostilities—rather than the actual date of the ceasefire. See House Hearings, supra, pages 1045-6.

In interpreting 18 USC § 3287, the Supreme Court has observed that the suspension of limitations is wholly without effect as to "frauds" committed following the "proclaimed" termination of hostilities. United States v. Smith, 342 US 225. Through providing that Article 43(f) shall embrace frauds occurring prior to the formal termination of hostilities, rather than only to those taking place before the ceasefire, Congress has expanded the coverage of the Article—and we are sure that it did so intentionally. In this connection we note that the predecessor of 18 USC § 3287 was amended expressly to include offenses proscribed by the Surplus Property Act and the Contract Settlement Act—offenses which will in many instances occur during the period immediately following the end of hostilities, but prior to a formal proclamation that hostilities have terminated. While this

---

[1] United States v. Smith, 342 US 225, 96 L ed 252, 72 S Ct 260 and related inferior court cases cited in the dissent to United States v. Ayers, 4 USCMA 220, 15 CMR 220, certainly do not purport to do this. This is true for the plain reason that the bearing of the Korean conflict on the problem there was in no slightest degree relied on by counsel or considered by the Court. Under no accepted theory of case interpretation of which the majority is aware may it be said that these decisions can help us here.

circumstance was insufficient to persuade the Supreme Court that Congress had intended to suspend the running of the statute as to all "frauds" effected during the three years following the termination proclamation, we do consider that this circumstance assists in revealing the purpose contemplated by Congress in its reference to termination of hostilities as "proclaimed." See United States v. Smith, supra. Accordingly, we do not feel that these words compel an acceptance of the defense argument that Article 43($f$) was intended to apply only in the event of a formally declared war, and that the Article is quite without effect as to "frauds" committed during the Korean fighting.

In construing Article 43($a$)—which removed all limitations on the prosecution of certain offenses committed "in time of war"—we determined that an absence without leave transpiring during the period of actual hostilities in Korea might lawfully be punished at any time. United States v. Ayers, 4 USCMA 220, 15 CMR 220. To our minds, this result obtained, although the absence had its inception within the continental limits of the United States. Ibid. We choose to apply to the instant problem a pragmatic approach identical to that utilized in Ayers. Congress—for one thing—recognized that during periods of hostilities huge sums of money are spent for materials and equipment—a circumstance which offers temptation to the unscrupulous. Moreover, in such instances there is an urgent need for haste—with the result that opportunities for the use of safeguards, which might otherwise be followed in Government procurement, are diminished. Certainly this was true following our entry into the Korean action in 1950. Often—and especially in the Armed Forces, which administer a substantial segment of Government procurement during the conduct of hostilities—the frequent turnover of personnel in administrative posts breeds temptation to fraud. Moreover, the law-enforcement branch of the Government in such periods is "busily engaged in its many duties, including the enforcement of the espionage, sabotage, and other laws." See much of the legislative history of 18 USC § 3287 and its predecessors as presented in United States v. Bridges, supra; United States v. Smith, supra.

When such reasons for suspending the period of limitations are examined, we detect scant basis for holding that the recent hostilities in Korea did not satisfy every requirement of Article 43($f$). The enormity of the action—as attested by the number of troops concerned, the number of casualties, and the large sums spent in equipping and maintaining these forces—presented as frequent opportunity for fraud as would have existed had the conflict been designated a "war" instead of a "police action." Our law-enforcement agencies appear to have been occupied busily during the period with the detection of espionage and subversion. The suddenness and surprise of the initial Communist onslaught distinctly served to provide a setting for that disorganization in which fraud might thrive. We may add that here—as in Ayers—we reject all distinction between offenses occurring in Korea and those taking place in the zone of the interior. Actually such a distinction would operate to make Article 43($f$) virtually inapplicable to the Korean episode, for most of the Armed Service contracts—which provide the chief opportunity for fraud—were consummated far from Korea. Indeed, it is normal that the base from which an Army is supported and maintained be kept at a reasonably safe distance from enemy forces, for the purpose of avoiding destruction in the event of a breakthrough.

Nor can we perceive any qualitative distinction in this area of "fraud" between Korea and other more pacific areas—aside, of course, from the possibility of greater disorganization in Korea. We may add, too, that a differentiation between Korea and other sections might lead to difficult problems of venue associated with the suspension of limitations. Under such a differentiation a "fraud" would remain subject to punishment substantially longer if committed in Korea than if committed elsewhere. But often there may be difficulty in determining the locale or

locales in which the fraud occurred. For example, if the fraud related to the furnishing of inferior clothing and equipment to the Armed Forces there, would the fraud have been committed in Korea—and therefore subject to the longer period of limitations—if some of the goods finally reached that country?

We consider that recent civilian cases support our position that the Korean fighting placed this country "at war" within the meaning of Article 43(f). See authorities cited in United States v. Ayers, supra. Moreover, as we sought to make clear in Ayers, nothing in those cases would lead to a differentiation within the present context between "frauds" occurring in Korea and those occurring elsewhere.

It is distinctly arguable—we must agree—that the specific factual situation of the case at bar does not fall squarely within the policies of Article 43(f). It is to be noted that the fraudulent enlistment by the accused was discovered—as indicated by the papers bound with the record of trial—through the medium of a routine check of fingerprints. Indeed, this constitutes the usual means for discovery of the offense in suit. Thus, the consequences of Korean hostilities could have operated to delay prosecution in only very indirect ways: for example, (a) by increasing the work of the Federal Bureau of Investigation to such an extent that fingerprint checks might not be accomplished as rapidly as usual; and (b) through leading to the accused's transfer to Japan, where he was in fact situated at the time the results of the fingerprint check were brought to the attention of military authorities. Indeed, in the course of these routine checks fraudulent enlistment is often quite easy to unearth. As an original proposition, therefore, it would have been open to us to hold that this particular type of "fraud" was not within the intendment of Congress in enacting Article 43(f), since it does not present the complexities and difficulties of detection so often characterizing wartime "frauds." However, in light of the interpretations the Supreme Court has given 18 USC § 3287—from which Article 43(f) was taken—we must consider

**238**

that the offense before us does fall within that Article. Consequently, the general Congressional intent concerning wartime "fraud," together with our analysis of that intent with respect to *de facto* conflicts like that in Korea, compel the conclusion that the prosecution in the instant case was not barred by limitations.

### III

It is obvious that the question of waiver has become irrelevant, since in our view the accused had nothing to waive—and we move to the issue having to do with the admissibility of the fingerprint certificates on which the prosecution relied. The prosecution offered in evidence two certificates of identity, one furnished by the Federal Bureau of Investigation, the other by the office of The Adjutant General, United States Army. Both certificates were attached to a *single* set of fingerprints, which purported to be those of Frank Taylor, Jr., taken on November 19, 1952. The certificate from the Bureau recited that the attached fingerprints were identical with those of one Leroy Zachman, a prior enlistee in the Air Force, and also with those of Herman Leroy Zachman, Jr., a prior enlistee in the Navy. The document from The Adjutant General made reference to the identical attached set of fingerprints—and in it the record custodian certified that the attached fingerprints "have been compared by a duly qualified fingerprint expert, on duty as such in this office, with the fingerprints on file in this office of Frank Taylor, Jr., Army service number RA33921838 (changed from RA 13376543), who enlisted 20 February 1951 for a period of three years at Baltimore, Maryland, photostatic copy of which is attached, and that the fingerprints are those of one and the same person."

It has been urged by appellate defense counsel that, while this second paper asserts that the fingerprints concerned were compared by a duly qualified expert, it does not state that this expert made the identification—but rather that the person who *signed* the certificate concluded that the attached fingerprints were identical with those of

Frank Taylor, Jr., on file in The Adjutant General's Office. We construe the document otherwise. If the person who signed the certificate intended it to express *his* conclusion concerning the comparison of signatures, it seems unlikely that he would have adverted to a comparison of fingerprints made by an expert, and at the same time would have omitted explicit mention of any such comparison effected by himself. The very purpose of the certificate of identity—which is the presentation of an expert's opinion following a comparison of fingerprints—suggests overwhelmingly that the results of the comparison made by the expert constitute the subject matter of the certificate.

Recently in United States v. White, 3 USCMA 666, 14 CMR 84, we upheld as an exception to the hearsay rule the provision of the Manual for Courts-Martial, United States, 1951, paragraph 143a, which authorizes the use of certificates of identity of the sort here involved. The chief difference between White and the case before us now is that in White testimony was presented by an investigator who had taken the fingerprints of the accused for the purpose of transmission to Washington for comparison. Here this was not the case. We observe that in authorizing certificates of identity, the Manual states at page 259:

". . . The attached fingerprints (those which had been forwarded for the purpose of comparison) may be identified as those of a particular individual by the testimony of the person who took them or by someone who was present at the time they were taken."

Does this sentence provide as a minimum requirement for admissibility that the fingerprints attached to the certificate of identity, and forwarded for comparison, must be identified by direct testimony, if the certificate is to be admissible in evidence? To put the question otherwise, is the testimony of the person who took the accused's fingerprints, or of one who saw them taken, a necessary foundation for the admissibility of a certificate concerning finger-

print comparison? We think not—as is indicated clearly by the use of the permissive "may" in the Manual quotation set out above. See United States v. Merritt, 1 USCMA 56, 1 CMR 56. Instead, in our view, this Manual language was intended only to free the Government from a conceivable requirement that the expert who fingerprinted the accused be called personally to testify that the prints attached to a certificate were taken from the accused person—and thus in a proper case to authorize the making of such proof by another who saw the fingerprinting routine carried out.

In the instant case, however, the Government did not seek to rely on direct testimony at all, but made use of an entirely different route to demonstrate that the prints purporting to have been taken from Frank Taylor, Jr., on November 19, 1952, were those of the accused. Both certificates of identity had reference to the *single* fingerprint card to which they both were attached. One recited that both Herman Leroy Zachman and Leroy Zachman were identical with the person whose fingerprints were on that card. The other certificate asserted that Frank Taylor, Jr., RA 33921838, who had enlisted in the United States Army on February 20, 1951, was identical with the person whose fingerprints appeared on the same card. From this evidence it was readily inferable that—whoever had made the fingerprints on the card involved—Herman Leroy Zachman, Jr., Leroy Zachman, and the Frank Taylor, Jr., who enlisted on February 20, 1951, were but different names for one and the same person. At the trial, the Government presented direct testimony to the effect that the accused had used the name "Frank Taylor" and the serial number RA33921838—circumstances suggesting compellingly that he was the Frank Taylor, Jr., who had enlisted on February 20, 1951—and therefore, in light of the certificates of identity, that he possessed the aliases Leroy Zachman and Herman Leroy Zachman, Jr. In addition, the Government introduced a photostatic copy of the enlistment rec-

**239**

ord of the Frank Taylor, Jr., who had enlisted in the Army on February 20, 1951, in Baltimore, Maryland. Apart from its revelation of the alleged misrepresentations, this photostat was significant in that it contained a signature purporting to be that of the enlistee, and which—in accordance with the presumption of regularity—must be taken prima facie to have been that of Frank Taylor, Jr. Even the most superficial examination of the enlistment signature displays its close similarity to signatures identified as those of the accused.

The Government—in proving the accused's identity as Frank Taylor, Jr.—certainly could have introduced testimony, either from the person who took his prints on November 19, 1952, or from one who saw the accused fingerprinted at that time. Of course, this would have shown that the accused was the person whose fingerprints were attached to the certificates of identity—and therefore that he was the Frank Taylor, Jr., who, in enlisting on February 20, 1951, had misrepresented prior service. However, the trial counsel did not choose to do this, but rested his proof of identity on other admissible evidence, which was equally effective in revealing that the accused was the Frank Taylor, Jr. who had enlisted fraudulently. We find no error whatever in this election by the Government. Nor do we find anything in the reasoning underlying the Manual exception touching certificates of fingerprint comparison which impugns the procedures utilized by the Government here. See United States v. White, supra.

## IV

Having found the questioned evidence admissible and sufficient to uphold the findings—and having concluded that prosecution of the accused was not barred by any applicable period of limitations—we must affirm the determination of the board of review.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

I dissent.

In my opinion the United States is not at war so as to suspend the running of the statute of limitations in this case. In United States v. Ayers, 4 USCMA 220, 15 CMR 220, I set out the reasons for my belief that the United Nations resistance to communist aggression in Korea did not create a state of war in the United States.

Since the statute of limitations was not suspended, it is necessary to determine whether the defense was waived by the accused. Ordinarily, a failure to interpose the statute of limitations constitutes a waiver. However, it is apparent that the Manual for Courts-Martial, United States, 1951, requires more than a mere failure to assert the statute in order to constitute a waiver. In two separate instances, the Manual expressly provides that the court "will bring the matter to the attention of the accused and advise him of his right to assert the statute unless it otherwise affirmatively appears that the accused is aware of his rights in the premises." Paragraph 68c, page 101, paragraph 53h, page 75. There is no such affirmative showing in this record. Consequently, the accused did not waive his right to assert the statute. However, since the Government has not been accorded an opportunity to show that the statute may have been tolled for at least a part of the time, see Article 43(d), 50 USC § 618, I would not dismiss the charges, but order a rehearing.